849

John ARMSTRONG; James Amauric; Richard Ponciano; Jack Swensen; Billy Beck; Judy Fendt; Walter Fratus; Gregory Sandoval; Darlene Madison; Peter A. Richardson; Steven Hill; David Rose; David Blessing; Elio Castro; Elmer Umbenhower; Raymond Hayes; Gene Horrocks; Kiah Mincey; Clifton Feathers; Willie Johnson; David Badillo; James Simmons; Flora Abrams; Joey Gough; Timothy Whisman, Plaintiffs–Appellees,

v.

Gray DAVIS, Governor of the State of California; Robert Presley, Secretary of the Youth and Adult Correctional Agency; James Nielsen, Chairman of the Board of Prison Terms; California Board of Prison Terms, Does 1–100, in Their Individual and Official Capacity, Defendants–Appellants.

No. 00–15132.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 2001

Filed Nov. 28, 2001

850

James M. Humes, California Deputy Attorney General, San Francisco, California, for the defendants-appellants.

Donald H. Specter, San Quentin, California; Michael W. Bien, San Francisco, California; Warren E. George, San Francisco, California; Sara Norman, Prison Law Office, San Quentin, California; Caroline N. Mitchell, Pillsbury Winthrop, San Francisco, California; and William Fernholtz, Rosen, Bien & Asaro, San Francisco, California, for the plaintiffs-appellees.

Before: REINHARDT, TASHIMA, and BERZON, Circuit Judges.

Opinion by Judge REINHARDT; Concurrence by Judge BERZON

REINHARDT, Circuit Judge:

The facts established at trial, and not disputed on appeal, demonstrate that the State of California regularly discriminated against disabled prisoners and parolees during its parole and parole revocation hearing processes. The district court found that the California Board of Prison Terms (the state parole authority) failed to make proper accommodations for numerous disabled prisoners and parolees, with the result that a number of such individuals forfeited their rights to parole and parole revocation hearings and appeals, while others were unable to represent themselves adequately at such proceedings, all in contravention of federal law. Following a ten-day bench trial, the district court held that the defendants engaged in systematic and widespread discrimination which violated the Americans with Disabilities Act and the Rehabilitation Act, holdings that the state officials and agency do not now challenge on the merits. The district court entered a system-wide injunction requiring the Board to modify its policies and practices to comply with federal statutory and constitutional standards.

On appeal, the Board asks us to dissolve the district court's injunction principally for the following reasons: (1) the plaintiffs lack standing to challenge its policy; (2) the district court must defer to the Board's decisions as long as they potentially further any penological interest; (3) the plaintiffs' settlement agreement with the Department of Corrections prohibits injunctive relief for any acts the Board delegates to the Department; (4) the plaintiff class was improperly certified and is not entitled to system-wide relief; (5) and the Prison Litigation Reform Act and federalism concerns preclude the type of injunctive relief ordered. In addition, the Board argues that plaintiffs have no due process right to a parole hearing. We have jurisdiction to hear this interlocutory appeal under 28 U.S.C. § 1292.

## I. BACKGROUND

The instant action was brought by a class of prisoners and parolees suffering from six categories of disability: mobility impairments; hearing disabilities; visual disabilities; learning disabilities; mental retardation; and renal impairments. Initially, the plaintiff class sued two divisions of the California Youth and Adult Corrections Authority (Agency or YACA): the Board of Prison Terms (Board or BPT)

and the California Department of Corrections (Department or CDC). The divisions have different areas of responsibility regarding prisoners and parolees. The plaintiffs alleged that the state's policies and practices as implemented by both divisions discriminated against them on the basis of disability in violation of the Americans with Disabilities Act (ADA) and section 504 of the Rehabilitation Act, as well as violated the due-process clause of the Fourteenth Amendment.

By agreement of the parties, litigation against the two divisions was bifurcated and proceeded on two separate tracks. This appeal involves only the order and injunction directed to the Board of Prison Terms and certain state officials responsible for its operations, and not the separate order and injunction addressed to the Department of Corrections. Neither the Board nor the state officials challenge the district court's conclusions that they engaged in system-wide violations of the ADA and Rehabilitation Act.

## A. Parties

The named plaintiffs are prisoners sentenced under California Penal Code § 1168 to life with the possibility of parole who complain that the Board failed to provide them with adequate accommodations at a variety of parole hearings, and parolees who complain about the lack of accommodations during the parole revocation process.[1]

The defendants in the part of the case now on appeal are Gray Davis, the Governor of the State of California; Robert Presley, Secretary of the Youth and Adult Correctional Agency; James Nielsen, Secretary of the Board of Prison Terms; and the Board itself. The Agency oversees the activities of its various boards and departments, including the Board of Prison Terms.[2] As the Secretary of the Agency, defendant Robert Presley is directly responsible to the Governor, for the operations of each department within the Agency. The Secretary is a member of the Governor's Cabinet, and advises the Governor on correctional matters and on any changes necessary to properly conduct the work of the Agency.

As noted, plaintiffs initially sued two of YACA's divisions in this lawsuit: the California Department of Corrections and the Board of Prison Terms. The Department, which is not a party to the portion of the action on appeal, is responsible for all relevant aspects of prisoners' and parolees' lives, except that it does not have authority over parole and parole revocation hear-

1. The life prisoners are: Elio Castro, who is mentally retarded and partially deaf; James Simmons, who is developmentally disabled; Raymond Hayes and Gene Horrocks, both of whom are mobility impaired; and Clifton Feathers and Willie Johnson, both of whom are visually impaired. The parolees whose paroles were revoked are: Joey Gough, Flora Abrams, Timothy Whisman, and David Badillo, all of whom are developmentally or learning disabled; David Rose and David Blessing, who are hearing impaired; Elmer Umbenhower, who is mobility impaired; and Kiah Mincey, who is visually impaired. Four of the parolees (Gough, Rose, Blessing, and Umbenhower) were incarcerated at the time of

the bench trial before the district court. It is unclear from the Third Amended Complaint whether the remaining class representatives, John Armstrong, Judy Fendt, Walter Fratus, and Gregory Sandoval, challenge conditions at hearings offered to life prisoners or parolees.

2. "The Youth and Adult Correctional Agency consists of the Department of Corrections, the Department of the Youth Authority, the Board of Prison Terms, the Youthful Offender Parole Board, the Board of Corrections, and the Narcotic Addict Evaluation Authority." Cal. Gov't.Code § 12811.

ings.[3] That authority is vested in the Board, which is one of the parties to this appeal.

The Board serves as the parole authority for the State of California, *see* Cal.Penal Code § 3000(b)(7). It conducts parole hearings for prisoners sentenced to a term of life with the possibility of parole, who are the only adult prisoners subject to such hearings under California law.[4] *See* Cal.Penal Code §§ 1168, 1170. In addition, the Board conducts revocation hearings for parolees accused of violating conditions of parole, Cal.Penal Code § 2645, and revocation extension hearings for prisoners who allegedly commit an offense while incarcerated because they have had their parole revoked.[5] Finally, the Board also conducts various custody hearings for offenders who are designated mentally disordered or sexually violent. It is the Board's discriminatory policies concerning against the disabled that form the basis for this appeal.

## B. Procedural History

### 1. Pre–Trial Proceedings

Pursuant to a "settlement agreement" entered into in its part of the instant case, the Department (which is not involved in the present appeal) filed a motion regarding the applicability of the ADA and Rehabilitation Act as applied to prisons. The agreement provided that if the district court held the Acts applicable, the Department would be found liable.[6] The stipulation explicitly stated, however, that it did "not resolve any issues between plaintiffs and the Board of Prison Terms or defendant Neilsen." The district court denied the Department's motion for summary judgment, held that the two statutes are applicable to prisons, entered a remedial order and permanent injunction, and certified the issue of the applicability of the Acts to the Department for interlocutory appeal. We affirmed the district court's holding on that issue.[7]

Plaintiffs continued to litigate their action against the Board. On January 5, 1998, the district court entered the parties' stipulation and order amending the class by including developmentally disabled prisoners so that the class "consists of all present and future California state prisoners and parolees with mobility, sight, hearing, learning, developmental and kidney

---

3. The Department monitors the prisoners' behavior while on parole: it does so through the Parole and Community Services Division. *See* Cal.Penal Code §§ 2400–2402, 5001–5003, 5054. *See also Terhune v. Superior Court*, 65 Cal.App.4th 864, 76 Cal.Rptr.2d 841, 847 (Cal.1988) (in bank) (parolee "under the legal custody of the Department").

4. Prisoners sentenced to lesser terms, under California's Determinate Sentencing Law, *see* Cal.Penal Code § 1170, are released on parole dates that are computed by the prison authorities pursuant to established rules.

5. All paroled prisoners are subject to supervision by state authorities, as well as to the possible revocation of their parole. Appeals from parole revocation and parole revocation extension hearings are also conducted by the Board.

6. The settlement agreement provided that, "if the Court determines that the ADA and § 504 apply to the California Department of Corrections," the court would enter an injunction "to require defendants to operate programs, activities, services and facilities of the California Department of Corrections in accordance with the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973."

7. This court has already decided two appeals on the Department's side of this litigation. *See Armstrong v. Wilson*, 124 F.3d 1019 (9th Cir.1997) (appeal from the denial of summary judgment); *Armstrong v. Davis*, 215 F.3d 1332, (9th Cir.2000) (table) (appeal from injunctive relief). The appeal before us is the first on the Board's side.

disabilities that substantially limit one or more of their major life activities." Plaintiffs filed a second amended complaint reflecting the amended class designation, and named the defendants listed in the caption of this appeal, as well as a number of other individuals who were associated with the Department.

The Board moved to dismiss or strike all defendants other than Nielsen and the Board from the Second Amended Complaint, arguing that the "settlement agreement" had resolved the plaintiffs' claims against them.[8] The court denied the Board's motions (other than as to the Director of the Department and his subordinates), on the ground that the Second Amended Complaint did not involve claims addressed in the settlement agreement, and that it did not constitute an attempt to retry the merits of those claims, nor to enforce the agreement collaterally. Thus, the court allowed the case against Governor Davis and Secretary Presley to proceed with respect to the matters now before us. Finally, at pre-trial conference, plaintiffs moved to amend their complaint by adding three more named plaintiffs. Defendants did not object, and the third amended complaint was filed on April 7, 1999.

## 2. Trial

The parties engaged in a ten-day bench trial before the district court.[9] Based on the testimony of multiple witnesses, many of them Board employees, the court found that the Board's parole notification, hearing, and appeals process depended to a great extent on written forms.[10] Whether in prison or outside, disabled prisoners and parolees were provided with inadequate accommodations to help them understand the content of those forms,[11] and as a consequence some plaintiffs waived their rights to a hearing and others failed to invoke their rights on appeal. Even if disabled prisoners or parolees made it to the hearing, a variety of barriers made

---

8. The Board also moved to dismiss the second amended complaint for failure to exhaust alternative judicial remedies as required by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and because the Board is not a "person" within the scope of § 1983. Plaintiffs withdrew their § 1983 action against the Board, but continued to sue Nielsen in his official capacity. The court held that the plaintiffs could sue Nielsen under § 1983 and, because they were not challenging the length of their confinement, were not required to exhaust alternative judicial remedies.

9. As we have noted, defendants do not appeal the court's factual findings.

10. "[T]he BPT … relies on extensive written communications, and some verbal interaction, to make … decisions [concerning parole or parole revocation]…. The BPT relies on written notices and forms to communicate vital information about prisoners' and parolees' parole status, and the BPT's procedures, to those prisoners and parolees."

11. "Defendants' forms and notices are not provided in alternative forms suitable for prisoners and parolees with vision or hearing impairments, or for learning or developmentally disabled prisoners or parolees. Furthermore, Defendants' policies and procedures for access to supporting documents and files, screening offers, hearings and appeals do not allow for effective communications with Plaintiff class members."

"[T]here are numerous examples of the BPT's failure to provide such auxiliary aids and services…. [T]he BPT failed to provide effective American Sign Language interpretation services to hearing impaired prisoners and parolees, failed to provide Braille materials, large print materials, audio tapes or qualified readers for visually impaired prisoners and parolees, failed to provide qualified readers for learning disabled prisoners and parolees, and failed to provide trained staff capable of effectively communicating with mentally retarded or learning disabled prisoners and parolees."

participation extremely difficult and access to the facilities impractical.[12]

The district court held that the Board failed to implement "a number of specific requirements [prescribed by the regulations implementing the ADA] designed to ensure that the framework exists for a public entity to carry out the substantive mandates of the ADA." Most particularly, the Board's mandatory self-evaluation plan was conducted "more than four years late [and] is inadequate."[13] Similarly, the district court held that the Board's transition plan was "inadequate,"[14] and that the notice provided to prisoners and parolees was "insufficient to apprise prisoners and parolees of the ADA's 'applicability to the services, programs, or activities' of the BPT or to 'apprise such persons of the protections against discrimination assured them by' the ADA." Both the transition plan and the notice forms were completed five years late. The court also held that the Board failed to provide the required ADA grievance procedures.

Ultimately, the district court held that the Board was not in substantial compliance with the ADA or the Rehabilitation Act, and that it routinely denied plaintiffs their rights under the Due Process Clause of the United States Constitution.

### 3. Injunctive Relief

After finding in favor of the plaintiffs, the district court entered an injunction requiring the Board to evaluate its policies, procedures, and facilities, as mandated by the ADA; to propose new policies and procedures to bring the Board into compliance with the Act, and then to attempt to reach an agreement on them with plaintiffs; to take specific steps toward ensuring that the facilities it uses are accessible; and to determine, with the participation of plaintiffs, the manner in which the Board's compliance with the injunction should be monitored. The injunction applies to:

> all hearings conducted by the BPT to determine whether and/or when a prisoner or parolee should be released on parole or involuntarily confined, including parole revocation and revocation extension hearings, life prisoner hearings (documentation hearings, progress hearings, parole hearings, parole consideration hearings, parole date rescission hearings and parole board rules hearings), mentally disordered offender hearings and sexually violent predator hearings. Parole proceedings also include any events related to the hearings that occur prior to or after the hearings, including, but not limited to, screening offers, psychological evaluations, central file reviews and administrative appeals.

The court required the Board to hire a full-time ADA coordinator and to do over its Self–Evaluation and Transition Plan, this time according to standards set by the court. To comply with the injunction, the

**12.** "Among other violations ... the BPT has failed to modify its programs to remedy ... accessibility and communications barriers. Moreover, the BPT has failed to consider disabled prisoners' inability to participate in the vocational and educational programs of the CDC when considering whether to recommend a life prisoner for parole."

**13.** "[T]he BPT's self-evaluation did not address the screening process, appeal process, adequacy of forms or other important element's of the BPT's programs and activities."

**14.** "The Self–Evaluation and Transition plan did not identify a single barrier to access, an omission which Plaintiffs' expert ... had never encountered in the hundreds of Self–Evaluation and Transition Plans he has reviewed.... Accordingly, the ... Plan did not discuss the methods or standards to use to eliminate or mitigate physical and communicative barriers to accessing the BPT's programs and services."

Board was required to redraft its policies to ensure that prisoners and parolees are provided with effective communications or otherwise "able to participate, to the best of their abilities, in any parole proceeding." The Board was to identify in advance of such proceedings which prisoners have a disability, create and maintain a system for tracking disabled prisoners and parolees, and provide them with accommodations at parole and parole revocation proceedings.[15] Under the terms of the injunction, the Board was also ordered to: revise all BPT forms used by prisoners and parolees to make them more comprehensible; provide alternative formats for all BPT forms used by prisoners and parolees; desist from shackling, during parole and parole revocation proceedings, the hands of hearing-impaired prisoners or parolees who use sign-language to communicate, unless prior approval is obtained; provide accommodations for prisoners or parolees who need to review their files in preparation for parole or revocation proceedings; provide accommodations for prisoners or parolees filing appeals from such proceedings; and establish grievance procedures by which prisoners may complain about ADA violations. Every official to whom the Board assigned responsibility for communicating with or supervising prisoners or parolees, including the Department's district hearing agents and correctional counselors, was required to undergo training in the general requirements of the ADA, disability awareness, the appropriate method of determining whether a prisoner adequately understands written and verbal communications, and other relevant policies and procedures developed in response to the injunction.

The court also ordered the Board to determine which facilities used to conduct parole proceedings were in compliance with the administrative regulations implementing the ADA; inform the Department of the facilities that were not fully accessible;[16] publish a description of any structural modifications to a facility that will make the parole proceedings accessible or identify another accessible location in which the proceedings will be held; and provide a schedule for making proceedings accessible for prisoners and parolees with disabilities at each Department facility or at an alternative accessible location. It did not, however, order the Board to make any physical changes to facilities, and it did not order the Department to take any action at all.

After engaging in the negotiations required by the injunction, the Board and the plaintiffs submitted a stipulation and proposed order, which was entered by the court, that delineated the "policies and procedures ... developed by defendants pursuant ... to the injunction and which fulfil [its] policy development obligations." The Board's new policies complied completely with the terms of the injunction. At oral argument before this court, the Board represented that it had implemented most of the new policies and practices agreed upon in the stipulation, that the court-ordered compliance with federal law did not cause it any practical difficulties, and that the outcome of this lawsuit would not affect the implementation of those policies and practices. Nevertheless, it determined that this appeal should be pursued.

## II. DISCUSSION

A district court's decision to grant prospective, system-wide injunctive relief is

---

15. The court order requires the Board to give the prisoner's or parolee's requested accommodation primary consideration when determining what accommodation to provide.

16. The Board was additionally to describe what parts of the facility are not accessible and what disabilities are not accommodated.

usually the product of a series of procedural decisions as well as a determination on the merits of the case. This case was no different. On appeal, however, the Board does not challenge the underlying merits decision, but instead raises a number of primarily procedural objections to the injunction. The Board challenges plaintiffs' standing, class certification, and the propriety and scope of injunctive relief. It argues that the named plaintiffs do not have standing to seek prospective relief; that, if they do, any relief should be limited to the named plaintiffs; that system-wide relief is not warranted for a number of reasons; that the injunction is not narrowly tailored to the injury asserted; that the injury and the acts required to remedy that injury are chargeable to the Department, not to it, and that the decree in the Department portion of the case precludes further relief in such circumstances; and, finally, that it is excused from compliance with the requirements of the ADA and the Rehabilitation Act in this case by virtue of legitimate penological justifications. In addition, appellees argue that defendants Gray Davis and Robert Presley should be dismissed.

We start by noting that where a district court grants system-wide injunctive relief, the issues of standing, class certification, and the propriety and scope of relief are often intermingled. *See, e.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As a result, the district court's findings of fact and rulings of law with regard to one aspect of the litigation will often buttress or make unnecessary further findings or rulings on another issue. For example, we have held that determinations relevant to standing, *see Hodgers–Durgin v. De La Vina,* 199 F.3d 1037, 1040 (9th Cir.1999) (en banc), or to class certification, *see Hawkins v. Comparet–Cassani,* 251 F.3d 1230, 1237 (9th Cir.2001), will also be rele-

vant to the grant of injunctive relief; and that determinations made with respect to class certification may also be relevant to the standing inquiry. *See LaDuke v. Nelson,* 762 F.2d 1318, 1326 (9th Cir.1985); *Hawkins,* 251 F.3d at 1237. Similarly, because the court may reconsider whether the plaintiffs have standing or have been appropriately certified as a class at the trial stage of the litigation, *see Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 518 U.S. 343 (1996), the court's findings at trial may be bolstered by its rulings at earlier stages of the litigation.

## A. Standing

The Board has challenged the district court's ruling on standing. We reiterate, however, that it did not challenge the factual findings on appeal, including those that support the district court's standing determination: while it argued that some of the legal conclusions were wrong, it did not object to any findings of fact or identify any specific errors regarding them as required by Federal Rule of Appellate Procedure 28(a)(7). Because the other elements of the "case" or "controversy" requirements have been met, we focus on the "injury in fact" requirement of Article III standing. *See Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

In order to assert claims on behalf of a class, a named plaintiff must have personally sustained or be in immediate danger of sustaining "some direct injury as a result of the challenged statute or official conduct." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). The harm suffered by a plaintiff must constitute "actual injury." *Lewis,* 518 U.S. at 348–49, 116 S.Ct. 2174. Moreover, where, as here, a plaintiff seeks prospective injunctive relief, he must demon-

strate "that he is realistically threatened by a *repetition* of [the violation]." *Lyons,* 461 U.S. at 109, 103 S.Ct. 1660 (emphasis added) (holding that plaintiff cannot establish the requisite type of harm simply by pointing to some past injury). We review questions of standing de novo. *See Tyler v. Cuomo,* 236 F.3d 1124, 1131 (9th Cir. 2000) (citation omitted). However, we will affirm standing when a district court has made "explicit" and "specific" findings establishing that the threatened injury is sufficiently likely to occur, *LaDuke,* 762 F.2d at 1323–24; *see also Hawkins,* 251 F.3d at 1237 (citing *LaDuke* ), unless those findings are clearly erroneous.

■ There are at least two ways in which to demonstrate that such injury is likely to recur. First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury "stems from" that policy. *Hawkins,* 251 F.3d at 1237. In other words, where the harm alleged is directly traceable to a written policy, *see Gomez v. Vernon,* 255 F.3d 1118, 1127 (9th Cir.2001), there is an implicit likelihood of its repetition in the immediate future. Second, the plaintiff may demonstrate that the harm is part of a "pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights." *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985). Thus, where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the "realistic repetition" requirement. In this regard, where the plaintiffs constitute a certified class, "it is not irrelevant that [the named plaintiffs] s[eek] to represent broader interests than [their] own." *LaDuke,* 762 F.2d at 1326. When a named plaintiff asserts injuries that have been inflicted upon a class of plaintiffs, we may consider those injuries in the context of

the harm asserted by the class as a whole, to determine whether a credible threat that the named plaintiff's injury will recur has been established. *Id.; see also Hawkins,* 251 F.3d at 1237.

Where a court, through its specific factual findings, documents the threat of future harm to the plaintiff class and establishes that the named plaintiffs (or some subset thereof sufficient to confer standing on the class as a whole) are personally subject to that harm, the "possibility of recurring injury ceases to be speculative," and standing is appropriate. *Thomas v. County of Los Angeles,* 978 F.2d 504, 507 (9th Cir.1993) (citation omitted). In the instant case, it is difficult to conceive of how the district court's seventy-four pages of factual findings could have been more diligent, detailed, or comprehensive, given the limitations of time and space available to our trial courts. Defendants do not challenge those findings on appeal, and they form the basis of our discussion of the Board's ADA policy and practice.

### 1. Written Policy

■ The Board's written policy is primarily contained in three documents: its Self–Evaluation and Transition Plan, its Administrative Directive, and its training documents, including guidelines provided to the Department employees. That policy was formulated to ensure that prisoners and parolees receive *due process* with respect to Board proceedings. Whether the Board succeeded in that objective is not of particular importance here. The ADA and Rehabilitation Act, as enforced through the Attorney General's regulations promulgated under the ADA, *see* 42 U.S.C. § 12134(a), require more than compliance with due process requirements: they require that a disabled individual be provided with "meaningful access" to state provided services and set forth a number of

detailed requirements that must be met. *See Alexander v. Choate*, 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir.1996).[17] The Board's written policy does not consider the particular needs of disabled prisoners and parolees. In particular, the policy does little, if anything, to address the needs of prisoners or parolees who have problems understanding complex information or communicating through the spoken or written word.

The Board's ADA policy relies upon form # 1073 at the notification stage and form # 1040 at the appeal stage. Form # 1073 purports to inform prisoners and parolees of their rights under the ADA.[18] Both forms are inadequate for the visually impaired, for those deaf individuals who do not understand written English, and for the learning disabled or mentally retarded who do not understand complex concepts. At the notification stage, the Board's only solution is to have a person serving the form explain it to the person served, if requested to do so; at the appeals stage, the Board does not even require that accommodation: so long as someone renders

some assistance, the policy is satisfied. The Board does not train its officials or employees to communicate with disabled individuals, and does not evaluate their ability to do so. The district court found that the minimal due process measures taken by the Board were insufficient to comply with the ADA or to enable plaintiffs properly to invoke or assert their rights.

The guidelines prepared by the Board and circulated to Department officials contemplate two forms of accommodation: the provision of an attorney or of an interpreter. These accommodations are offered primarily at the discretion of the Department employees, and they need not be provided where the employee believes that the prisoner or parolee has little likelihood of success on the merits at the hearing.[19] Even when an accommodation is furnished it is often ineffective, and the lack of appropriate accommodations has resulted in prisoners and parolees waiving or misunderstanding their rights at the notification stage; being prevented from adequately preparing for hearings; failing to understand proceedings during hearings; and

---

17. Because "[t]he Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance—which the [California] prison system admittedly does [and] [s]ince the ADA has a broader scope, we will confine our discussion to it." *Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir.1997), *abrogated on other grounds by Erickson v. Board of Governors of State Colls. and Univs. for Northeastern Ill. Univ.*, 207 F.3d 945 (7th Cir.2000).

18. Form # 1073 repeats the language from the ADA stating that "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, or be denied benefits of the services, activities, or programs of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132. If the prisoner or parolee is identified as having a disability under the

ADA, either he or the serving officer must complete the form to describe the disability, how the disability prevents effective participation at the Board hearing, and what accommodation is requested, and the prisoner or parolee must state the means by which he can verify his disability.

19. Timothy Whisman, who is learning disabled, was denied the assistance of an attorney at parole revocation hearings. He had difficulty understanding the paperwork and the proceedings. David Rose, who is deaf, requires an interpreter to communicate effectively. He was denied an interpreter for his parole revocation hearing, even though he told the parole officer he could not understand what was being said. Kiah Mincey, who is legally blind, was denied the assistance of an attorney for his parole revocation hearing and was not allowed a reader at the hearing.

being unable to assert grievances on appeal.[20]

The Board's written policy does not provide for the making of any effort to determine in advance whether a particular hearing facility is accessible for the mobility impaired. Instead, if a deputy commissioner is informed that there is a physical barrier to access, he will halt the hearing until a reasonable accommodation can be made. Such a procedure results in mobility-impaired prisoners and especially parolees spending extra time in custody awaiting their hearing.

In sum, the Board's written policy does not comply with the requirements of the ADA. As a general rule, injuries can stem from a failure to take action as well as from affirmative conduct. Here, plaintiffs were injured by the Board's failure to comply with the Act's requirements. They suffered discrimination on account of disability as a consequence, including the impairment or loss of services or programs provided by the Board. The Board's failure to comply also makes likely the recurrence of such injuries in the immediate future.

### 2. Practice

The Board's practice is to rely primarily on Department employees untrained in issues of disability to determine whether an individual is disabled or not, what accommodations are appropriate if he is, and whether those accommodations will be provided. These employees include the Department's institutional staff in the case of state inmates subject to life prisoner parole proceedings, and members of the Department's Parole and Community Services Division, acting on behalf of the Board, in the case of individuals subject to parole revocation proceedings. At the notification stage, disabled prisoners and parolees routinely waive their rights to hearings, frequently because they cannot comprehend the information provided to them.[21] Relatively few Department employees make inquiries in order to determine whether an accommodation is needed, and the Board's ADA officials who evaluate both such inquiries and inquiries made by the Board's hearing officers, do so on the basis of a "due process" standard that does not comport with the requirements of the ADA. In practice, the Board supplies only the three types of accommodation described above—an attorney untrained in communications with the disabled; a similarly untrained interpreter; or a delay in proceedings while the hearing is rescheduled.

In conjunction with the Board's written policy, its practice throughout the parole and parole revocation process routinely deprives disabled prisoners and parolees of

---

**20.** James Simmons, who is mildly to moderately mentally retarded, did not understand the proceedings at his parole hearing even though he was represented by an attorney. Elio Castro, who is mentally retarded and partially deaf, could not understand the proceedings during his hearing because the interpreter signed too quickly and used unfamiliar vocabulary. Willie Johnson, who is legally blind, was unable to review adequately his central file in preparation for his hearing because the reader placed a limit on the number of documents she would review with him. Johnson was unable to appeal from his hearing because he lacked help filling out the forms.

**21.** For example, Flora Abrams and Joey Gough, who are learning disabled, David Badillo, who is mildly to moderately mentally retarded, and David Blessing, who is deaf, all waived their rights to parole revocation hearings because the Board failed adequately to communicate their rights to them. Clifton Feathers, who is blind, did not know he could be provided with a reader to help him review his central file in preparation for his forthcoming hearing.

their rights under the ADA. The Board's practice, consistent with its policies, permits Board and Department employees to deny appropriate accommodations requested by disabled prisoners and parolees, and instead to rely on a narrow and unsatisfactory range of alternatives. The Board's adherence to its "due process" standard undermines the ability of disabled prisoners and parolees to communicate with and comprehend Department and Board officials, at hearings and otherwise, and precludes the mobility impaired from access to hearings. Such treatment not only results in offense and frustration; it appears to have resulted in significant periods of unwarranted incarceration for a number of disabled parolees. Thus, as in the case of its written policy, the Board's practices warrant the holding that the "realistic repetition" requirement has been met, and that the named plaintiffs have established standing.

### 3. Plaintiff Class

■ Class membership may also be relevant to show an immediate likelihood of future injury. Where a named plaintiff is a member of a plaintiff class, and "members of the class have repeatedly suffered personal injuries in the past that can fairly be traced to the [defendants'] standard ... practices," the defendant's treatment of the class as a whole must be considered to determine whether the individual plaintiff "ha[s] been and will continue to be aggrieved by the defendants' [illegal] pattern of conduct." *LaDuke,* 762 F.2d at 1326. Here, plaintiffs provided overwhelming evidence of discrimination against the named plaintiffs as well as other, individually identified class members. That discrimination stretches back, in some instances, over ten years, and at the time of trial showed no signs of abating. The injury suffered by the named plaintiffs is sufficiently similar to that endured by the rest of the class to establish a pattern of discrimination that threatens to recur. The district court made findings of fact, which have ample support in the record, that named plaintiffs suffered repeated acts of discrimination, whether in prison or on parole. Accordingly, based on past occurrences, the threat of future injury to the named plaintiffs as well as to the class itself is both real and immediate.

### 4. Actual Injury

The named plaintiffs are injured by the Board's policies and practices relating to its parole and parole revocation proceedings: plaintiffs are subjected to discriminatory treatment on account of their disabilities in violation of both the ADA and the Rehabilitation Act. This treatment is sufficient to constitute an actual injury. Furthermore, as a consequence of the Board's unlawful discrimination, plaintiffs were unable to comprehend various parts of the parole and parole revocation process or denied the opportunity to attend the required hearings, and may even have been wrongfully incarcerated or denied parole. This too constitutes actual injury.

We comment briefly on the Board's contention that the deprivation of a fair parole hearing can not in itself constitute such injury. The Board contends that California Penal Code § 3041 does not create a fourteenth amendment due process right to such a hearing. However, following *Ellis v. District of Columbia,* 84 F.3d 1413, 1418 (D.C.Cir.1996) (holding that, until Supreme Court speaks more directly to the issue, prisoners' right to pre-release revocation hearing unaffected by holding in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)), we hold that the statute is sufficiently determinate to require such hearings as a matter of constitutional right. Thus, we need not find a constitutional violation to establish actual

injury under the ADA and the Rehabilitation Act. In addition to prohibiting discriminatory treatment, those statutes prohibit defendants from denying plaintiffs "the benefits of [their] services, programs, or activities." Here, under the facts found by the district court, the plaintiffs were denied such benefits by virtue of the Board's failure to make accommodations that would enable them to attend or comprehend parole and parole revocation hearings. This, in itself, constitutes "actual injury."

Our holding is consistent with *Lewis,* in which the plaintiffs' asserted injury resulted from inadequate library facilities. The Supreme Court held that there was no right to library facilities, but only a right to access to courts, and that in most cases prisoners had failed to show how the prison's library policy infringed upon that right, given that other means of accessing the courts were available. It did, however, find actual injury in two instances, one of which was when a prisoner was "so stymied ... that he was unable to file a complaint" to remedy an "arguably actionable" harm. 518 U.S. at 351, 116 S.Ct. 2174. Thus, *Lewis* simply requires that in order to show actual injury plaintiffs must identify an actual right that has been violated. Here, actual injury exists because plaintiffs' rights to be free from discriminatory treatment, as provided by the ADA and the Rehabilitation Act, have been violated, and because they have been deprived of services or programs provided by the Board: fair parole and parole revocation hearings. Either violation, standing alone, is sufficient to constitute actual injury.

### 5. The Board's Objections to Standing

Defendants argue that the plaintiffs cannot meet the "likelihood of repetition" requirement, because their right to parole and parole revocation hearings depends upon their engaging in illegal conduct that they are under an obligation to avoid. Although we have held that there is sufficient likelihood that an injury inflicted during a hearing will be repeated when a plaintiff can assert a right to another such hearing, *see Hawkins,* 251 F.3d at 1237, nonetheless, standing is inappropriate where the future injury could be inflicted only in the event of future illegal conduct by the plaintiff. *Lyons,* 461 U.S. at 108, 103 S.Ct. 1660. *See also Hodgers–Durgin v. De La Vina,* 199 F.3d 1037, 1041 (9th Cir.1999) (en banc) (no standing where injury "contingent upon respondents' violating the law, getting caught, and being convicted.").

With respect to the prisoners' complaints regarding conditions at their various hearings, the Board's regulations require that prisoners sentenced to life with the possibility of parole be provided with certain hearings as a matter of formal Board policy. These include documentation hearings, progress hearings, and recision hearings, as well as the parole hearings themselves. No matter how well behaved the prisoners are, no matter how pure and proper their conduct, they must receive the specified hearings, so that the Board may document or determine their parole suitability. The Board's regulations establish that prisoners of the type before us are entitled to parole hearings before the Board at least every five years, and as often as every year, unless they waive those hearings. The likelihood that a prisoner will be subjected to the hearings involved is, therefore, not at all speculative; rather, it is certain. The lawfulness or unlawfulness of his conduct in the interim is irrelevant to that fact.

The situation is different with respect to the complaints of parolees regarding de-

privations of their rights in connection with the parole revocation process. The Board asserts that these plaintiffs could avoid parole revocation hearings entirely by refraining from engaging in future illegal conduct. For support of this proposition, it relies on *Lyons*, 461 U.S. at 102, 103 S.Ct. 1660 (no standing where likelihood of further injury premised on repetition of unlawful traffic violation); *O'Shea*, 414 U.S. at 497, 94 S.Ct. 669 (no standing where plaintiffs planned to induce future injury by unlawful civil disobedience); and *Spencer v. Kemna*, 523 U.S. 1, 13, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (no standing where future injury will not arise unless plaintiff has been convicted of and served sentence for future unlawful conduct). To the extent that these cases hold that standing does not exist where plaintiffs can avoid future injury by refraining from illegal conduct, they are not apposite here.

In *Hodgers–Durgin*, we expressly distinguished the *Lyons* line of cases on the basis that the *Hodgers–Durgin* plaintiffs asserted that the conduct on their part that triggered the defendants' violations was not unlawful. In that case, the plaintiffs alleged that while driving their vehicles in the normal course, they were stopped by the United States Border Patrol on the basis of their race, or because of their proximity to the border. We found that the plaintiffs had standing because, although the police were sufficiently suspicious of the plaintiffs to stop, question, and search them, "plaintiffs did nothing illegal to prompt the stops by the Border Patrol." *Hodgers–Durgin*, 199 F.3d at 1041.[22]

Here, as in *Hodgers–Durgin*, plaintiffs need not engage in unlawful conduct to become subject to the unlawful practices they seek to enjoin. The Board is not required to establish probable cause to begin the parole revocation process, nor is it necessary that any law enforcement officer observe the alleged violation:[23] the Board may start parole revocation proceedings when a rather low level of suspicion arises as the result of "some minimal inquiry" into the facts of the case. *See Morrissey v. Brewer*, 408 U.S. 471, 485, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[24] However, mere suspicion of misconduct is insufficient to defeat standing: in *Hodgers–Durgin*, although the Border Patrol officers were suspicious enough to stop, question, and search the plaintiffs' cars, we still found that the plaintiffs had standing to sue.[25]

**22.** By contrast, in *Lyons*, 461 U.S. at 102, 103 S.Ct. 1660, a police officer observed the traffic violation that led to Lyons's injury and Lyons did not deny his guilt.

**23.** Parolees are subject to a parole revocation hearing when a member of the Parole and Community Services Division reports a suspected violation of the conditions of parole to the Board. *See* Cal.Code Regs. tit.15 § 2615.

**24.** Prior to a parole revocation hearing the Board serves notice of the hearing on the parolee and, at the same time, presents him with a form explaining his rights under the ADA (form # 1073) and a "screening offer:" a determinate prison sentence of one year or less conditioned upon the parolee's agreement to waive his revocation hearing. By accepting the screening offer without properly comprehending its import, some of the parolee-plaintiffs agreed to prison sentences on the first occasion that they were informed that they were subject to parole revocation proceedings, and well before the Board had anything more than the limited degree of suspicion required to subject them to such hearings.

**25.** In *Hodgers–Durgin*, we additionally noted that, unlike *Lyons* there was "no string of contingencies necessary to produce an injury" after the stop: the stop led inexorably to the injury. 199 F.3d at 1041–1042. Here, it is the parole revocation notification and hearing process itself that is discriminatory and that

Next, the Board contends that the named plaintiffs have failed to demonstrate standing for "each type of relief sought," and cite *Lewis v. Casey* for that proposition. However, *Lewis* simply limits standing to the injury shown: a plaintiff who has been subject to injurious conduct of one kind does not have standing to sue for a different, although similar, injury to which he has not been subjected. 518 U.S. at 358 n. 6, 116 S.Ct. 2174. When determining what constitutes the same type of relief or the same kind of injury, we must be careful not to employ too narrow or technical an approach. Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry. Viewed in this light, the named plaintiffs all established the same injury: that the Board propounded a policy and engaged in a practice that denied them their rights under the ADA, and harmed them by preventing them from attending, communicating at, or comprehending parole and parole revocation hearings. Each showed that the Board discriminated against him, in a manner that resulted in a failure to afford him the benefit of the same service or program. As a result, it is evident that each suffered from the same injurious conduct; each incurred the same injury; and each is seeking the same relief.

The Board also asserts that the likelihood that the parolee plaintiffs will be subject to a future parole revocation hearing is purely speculative. However, five of the parolee plaintiffs were repeatedly subjected to parole revocation proceedings, some of them on a yearly basis. Abrams, Whisman, Blessing, and Badillo, waived their rights to a parole hearing because the accommodations provided did not en-

able them to comprehend the notification proceedings; Gough was unable to understand the notification or hearing process. Because the named-plaintiff parolees can establish a pattern of continuing discrimination that shows no sign of abating, we find that the parolee plaintiffs have standing to sue for a violation the ADA.

Our conclusion is bolstered by the fact that a person with disabilities is more likely to be suspected of conduct that results in the revocation of parole than other parolees. The district court specifically found that hearing impaired, learning impaired, and developmentally disabled individuals engage in a range of coping mechanisms that can give the false impression of uncooperative behavior or lack of remorse. It is therefore likely that these individuals will have difficulty interacting with the personnel who supervise their parole, explaining any innocent but non-conforming behavior, and showing remorse for otherwise minor infractions of the conditions of their parole that do not rise to the level of unlawful conduct. These problems make it more likely that such parolees will be subjected to the parole revocation process, even though they have not committed any unlawful act or violated any condition of their parole.

**B. Class Certification**

■ The district court's decision certifying the class is subject to a "very limited" review and will be reversed "only upon a strong showing that the district court's decision was a clear abuse of discretion." *In re Mego Financial Corp. Secs. Litig.*, 213 F.3d 454, 461 (9th Cir.2000) (citation omitted). As a preliminary matter, we note that, after the evidentiary hearing on the first motion for class certification, the state defendants stipulated to a motion

---

constitutes the injury: the discriminatory treatment incurred by persons with disabili-

ties and the failure to provide them with statutory services.

amending the plaintiff class, and then did not object when the class was amended a second time at the pre-trial hearing. Furthermore, the district court's findings of fact generally support its grant of class certification.

Under Federal Rule of Civil Procedure 23(a), "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." In addition, to prosecute a class action, the plaintiffs must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

In the instant case, the Board asserts that the named plaintiffs fail to satisfy the standards of commonality and typicality required by Federal Rule of Civil Procedure 23(a). Although the commonality and typicality requirements tend to merge into one another, *see General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), they are stated differently. The commonality requirement is said to be met if plaintiffs' grievances share a common question of law or of fact. *See Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Typicality, by contrast, is said to require that the claims of the class representatives be typical of those of the class, and to be "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove

the defendant's liability." *Marisol v. Giuliani,* 126 F.3d 372, 376 (2nd Cir.1997). The crux of both requirements is to ensure that "maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

### 1. Commonality

The Board argues that a wide variation in the nature of the particular class members' disabilities precludes a finding of commonality. It asserts, in effect, that separate representative lawsuits should be filed by the hearing impaired, the vision impaired, the developmentally disabled, the learning impaired, and the mobility impaired. We reject this approach to class-action litigation. We have previously held, in a civil-rights suit, that commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. *See LaDuke,* 762 F.2d at 1332; *see also* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.23[5][f] (3d ed.1999) (citing *LaDuke* ). In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality. *See Baby Neal,* 43 F.3d at 56. Certainly, the differences that exist here do not justify requiring groups of persons with different disabilities, all of whom suffer similar harm from the Board's failure to accommodate their disabilities, to prosecute separate actions. The commonality requirement is met.

### 2. Typicality

Where the challenged conduct is a policy or practice that affects all class members, the underlying issue presented with respect to typicality is similar to that presented with respect to commonality, al-

though the emphasis may be different. In such a case, because the cause of the injury is the same—here, the Board's discriminatory policy and practice—the typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class. We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Here, the injuries are identical. The plaintiffs all suffer a refusal or failure to afford them accommodations as required by statute, and are objects of discriminatory treatment on account of their disabilities. On a more specific level, the injuries lie in the inability of prisoners and parolees with disabilities to comprehend what is occurring at the parole and parole revocation hearings and to communicate with those presiding (or in some instances even to obtain such hearings) and, in the case of mobility impaired individuals, to overcome the physical barriers to attendance. Thus, the plaintiffs all suffer the deprivation of "services, programs, or activities," provided by the Board, or fail to receive the full benefit of such services. 42 U.S.C. § 12132. Although there are minor differences in the nature of the specific injuries suffered by the various class members, the differences are insufficient to defeat typicality.

### 3. Defective Certification

While the class certification is generally proper, it is defective in two respects.

First, in addition to the prisoners and parolees with sight, hearing, learning, developmental and mobility disabilities, the district court designated individuals with kidney disabilities as members of the class. As amended, however, the class no longer includes a named plaintiff with a kidney disability. We are unable to determine from the district court's decision or the parties briefs (which do not mention the subject) what injuries, if any, prisoners or parolees with renal disorders suffer as a result of the defendants' failure to comply with the law. Accordingly, should the plaintiffs wish to maintain a claim on behalf of prisoners and parolees with kidney disabilities, they would have to amend the complaint to include one or more individuals with such disabilities among the named plaintiffs, and set forth the facts showing how they are injured.

Second, in addition to life prisoner hearings, parole revocation hearings, and parole revocation extension hearings, the plaintiffs challenge the Board's procedures relating to the hearing process for Sexually Violent Predators and Mentally Disordered Offenders.[26] None of the named plaintiffs, however, is a sexually violent predator or a mentally disordered offender. Those two categories of putative class members may be sufficiently distinct from the other class members that separate class representatives are necessary in order to ensure that their interests are fairly and adequately protected. *See Hanon*, 976 F.2d at 508. At least, on the record presented, we cannot say they are sufficiently similar. On remand, plaintiffs may

---

**26.** *See* Cal.Penal Code §§ 2960–2681 (mentally disordered offenders); Cal.Code Regs. tit. 15 § 2600.1 (sexually violent predators). The Board's rules regulating the treatment of mentally disordered offenders provide for three hearings: a certification hearing, Cal. Code Regs. tit. 15 § 2570(a); a placement hearing, § 2570(e); and an annual review hearing, § 2570(k). Sexually violent predators are subject to a screening hearing under Cal.Code Regs. tit. 15 § 2600.1.

choose to add additional named plaintiffs to represent the claims of sexually violent predators and mentally disordered offenders, "or to otherwise refashion this action to remedy class defects." *Hawkins*, 251 F.3d at 1238.

### C. Scope of Injunctive Relief

The district court identified three general areas in which the Board did not comply with the mandatory provisions of the ADA and the regulations implementing that Act by failing to: (1) provide effective communications during the notification, hearing, and appeals process; (2) modify policies and procedures to provide reasonable accommodations to disabled prisoners and parolees; and (3) select facilities accessible to the mobility-impaired. After making detailed factual findings on each of these issues, the court specified the manner in which the Board violated the ADA, holding that the defendants "have engaged in ongoing, extensive, system-wide violations of the ADA, Section 504 and the Constitution.... [S]ystemic injunctive relief in this case is therefore justified." The injunctive relief granted was deliberately and particularly tailored to address each of the violations identified in the district court's order. The Board contends that the relief awarded is overbroad for two reasons: (1) the district court should have considered only the injuries suffered by the named plaintiffs, and limited relief accordingly; and (2) federalism concerns

preclude the court from anything other than the most minimal interference in a state parole system.

### 1. System–Wide Relief

■■■■ "The scope of injunctive relief is dictated by the extent of the violation established." *Lewis*, 518 U.S. at 359, 116 S.Ct. 2174. The key question, for purposes of *Lewis*, is whether the inadequacy complained of is in fact "widespread enough to justify system wide relief." *Lewis*, 518 U.S. at 359, 116 S.Ct. 2174. *Lewis* reiterates the longstanding maxim that injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation. *See Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). System-wide relief is required if the injury is the result of violations of a statute or the constitution that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury. However, if injunctive relief is premised upon only a few isolated violations affecting a narrow range of plaintiffs, its scope must be limited accordingly.[27]

We also note that the decision to grant system-wide prospective injunctive relief does not occur in a vacuum; it is intimate-

---

**27.** When plaintiffs seek relief against a state agency, but relief on behalf of a large class of plaintiffs is inappropriate, we will limit relief to the named plaintiffs. *See Gomez v. Vernon*, 255 F.3d 1118, 1130 (9th Cir.2001) (where class relief inappropriate, prospective relief properly limited to just six inmates); *see also Rizzo*, 423 U.S. at 367–69, 96 S.Ct. 598 (where only two of 28 alleged incidents, involving only two police officers, involved deprivation of a federal right, broad-based relief not warranted); *Lyons*, 461 U.S. at 97–100,

103 S.Ct. 1660 (single plaintiff's allegation that his constitutional rights were violated insufficient to justify city-wide injunctive relief). By contrast, where the district court makes findings of fact sufficient to demonstrate a system-wide injury, resulting from policies and practices that pervade the state institution, widespread relief is justified to remedy that injury. *See Lewis*, 518 U.S. at 360 n. 7, 116 S.Ct. 2174 (prisoners must prove that denial of federal right pervaded system to justify system-wide relief).

ly connected to determinations made earlier in the lawsuit. The court's rulings concerning the likelihood of future injury at the standing stage "obviously shade[s] into those determining whether the complaint states a sound basis for equitable relief." *Lyons*, 461 U.S. at 103, 103 S.Ct. 1660 (citing *O'Shea*, 414 U.S. at 499, 94 S.Ct. 669). And the court's determination that relief may be sought by a class of plaintiffs is relevant to the scope of the relief to be awarded. In fact, class certification serves to alter the court's inquiry: when a class is properly certified, the injury asserted by the named plaintiffs at the standing stage of our inquiry is asserted on behalf of all members of the class. Accordingly, although in a class-action lawsuit, as in any other suit, "the remedy must ... be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *see Lewis*, 518 U.S. at 357, 116 S.Ct. 2174, the "plaintiff" has been broadened to include the class as a whole, and no longer simply those named in the complaint.

▬ In this case, system-wide injunctive relief was justified by the district court's extensive findings of fact setting forth in meticulous detail the injuries suffered by seventeen different prisoners and parolees at a variety of Board facilities and hearings. The district court expressly noted that these findings were not limited to the individual prisoners and parolees named in its opinion, but extended to members of the class throughout the parole system. The Board's treatment of the seventeen individuals was symptomatic of its treatment of a broad class of inmates with disabilities; and all of the violations the court found stemmed from the policies and practices of the Board, permeated its institutions, and were condoned by officials ranging from Commissioner Nielsen to the Board's deputy commissioners and Department officials acting as agents of the Board and under its guidelines. Such findings are sufficient to satisfy *Lewis*'s requirement that factual findings support the relief sought.

Furthermore, we note that *Lewis* does not require a particular number of named plaintiffs before system-wide relief is appropriate. In a class-action lawsuit, Rule 23(b)(2) enables a trial court to determine the appropriateness of system-wide relief based on the individual experiences of the named plaintiffs. The district court retains wide discretion to hear evidence tending to establish the scope of the class and the range of claims it represents. For class certification to occur, the court must find that the named plaintiffs adequately represent the interests and experiences of the overall class. In making such findings, the trial court must be afforded a wide degree of discretion to determine when a particular number of inmate witnesses is sufficient to justify system-wide relief for the identified violation. So long as the trial court's conclusion is based upon adequate findings supported by substantial evidence in the record, we must defer to its evaluation of the scope of the class and the injury it suffered. In so doing we recognize the utility and propriety of various procedural rules (like the class action device) that authorize the trial court to view individual items of evidence as representative of larger conditions or problems.[28]

---

28. Federal Rule of Civil Procedure 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court. The district court may permit discovery to determine whether class certification is appropriate, *see Kamm v. California City Dev. Co.*, 509 F.2d 205, 209 (9th Cir.1975), may limit such discovery to class certification issues, and may make appropriate orders to control the course of proceedings or prescribing measures to

The main concern of *Lewis* is to ensure that courts do not enter broader injunctions than are necessary, and do not prohibit conduct that is not threatened. (*See* also *supra* Part II.B) This is certainly not the case here.[29]

### 2. Prison Litigation Reform Act

■ In determining the scope of injunctive relief that interferes with the affairs of a state agency, we must ensure, out of federalism concerns, that the injunction "heel[s] close to the identified violation," *Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir.2000) (citation omitted), and is not overly "intrusive and unworkable ... [and] would [not] require for its enforcement the continuous supervision by the federal court over the conduct of [state officers]." *O'Shea*, 414 U.S. at 500, 501, 94 S.Ct. 669. As we recently noted, these concerns have been codified in the Prison Litigation Reform Act, 18 U.S.C. § 3626 (PLRA).[30] *See Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir.2001) (PLRA "has not substantially changed the threshold findings and standards required to justify an injunction.").

■ Here, the district court specifically made the findings required by the PLRA, *see* 18 U.S.C. § 3626(a)(1), and narrowly tailored the injunction to remedy only those violations of the ADA and Rehabilitation Act established in the district court's findings of fact. The court permitted the state to develop the policies and programs necessary to remedy its violation of the ADA and Rehabilitation Act, and afforded the plaintiffs an opportunity to object to the state's proposals.[31] The Board and the plaintiffs subsequently stipulated to the propriety of the new policies and procedures, and they have in fact been

prevent undue repetition or complication in the presentation of evidence or an argument, Fed.R.Civ.P. 23(d)(4). Where appropriate, the district court may redefine the class, *see Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 467 (9th Cir.1987), may excise portions of a plaintiffs class allegations, and may even decertify the class. Fed.R.Civ.P. 23(d)(4). These procedural tools ensure that the district courts can fully investigate class certification issues, and require us to continue to give deference to the district court's decision on certification and the scope of the class through the remedy stage of the proceedings, unless the court abuses its discretion. *See Midgett v. Tri–County Metropolitan Transp. Dist. of Oregon*, 254 F.3d 846, 849 (9th Cir. 2001) (citation omitted).

29. Because the Board's violations of the ADA (and the Rehabilitation Act) are sufficient to support the issuance of the injunction before us, we need not consider whether the violations of the Due Process Clause found by the District court would provide an alternative basis.

30. The PLRA requires that prospective injunctive relief against a state prison system be "narrowly drawn, extend[ ] no further than

necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." *Id.* at § 3626(a)(1). We note that the PLRA's provisions are explicitly limited to "prison conditions," and do not extend to the parole context. *Cf. Page v. Torrey*, 201 F.3d 1136, 1140 (9th Cir.2000) (holding that parolee is not "prisoner" for purposes of PLRA). For the purposes of this section of our opinion, however, we will analyze the issues as if the PLRA applied to all aspects of the case.

31. This procedure is required by, among other cases, *Lewis*, 518 U.S. at 362, 116 S.Ct. 2174. (court required to "giv[e] the States the first opportunity to correct the errors made in the internal administration of their prisons"). Here, the district court charged the Board with developing new policies and procedures to ensure compliance with the ADA, and the state responded by proposing policies and procedures, entering into negotiations with plaintiffs and stipulating to a new set of policies and procedures. This is precisely the process contemplated by *Lewis*.

implemented.[32]

Although it is often difficult to discern the precise nature of the Board's arguments, it appears that the Board essentially objects not to the process that the district court employed, but to the content of the injunction. In particular, the Board appears to contend that the injunction improperly interferes with its activities by dictating particular remedies, including: employing a full-time ADA coordinator; training its staff and the attorneys provided to individuals with disabilities; providing assistance to parolees preparing for revocation hearings; ensuring the availability of forms in comprehensible alternative formats; and obtaining permission from a delegate of the Board Chairman before permitting the shackling of an inmate who requires a sign-language interpreter at a parole or parole revocation hearing. The majority of the provisions of which the Board complains are required by regulations implementing the ADA and the Rehabilitation Act. *See* 28 C.F.R. §§ 35.107 (ADA coordinator and grievance procedures) 35.150(b) (transition plan); 35.105 (self-evaluation); 35.160 and Pt. 35, App. A (effective communications; primary consideration be given to disabled individual's requested accommodation). Moreover, the court is entitled to give some guidance to the Board and set some deadlines for compliance. By her injunction, the thorough and extremely patient district judge did not attempt to "micro manage" the Board's activities, but rather to set clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them.[33]

Finally, although the Board complains that the new policies impose unspecified financial and administrative burdens, we note that some such burdens are shared by all state agencies required to implement the ADA and Rehabilitation Acts. Aside from this general, but unfounded, concern, the Board has apparently experienced no burdensome interference with its parole and parole revocation process. In short, there is nothing to suggest that the injunction is unworkable: indeed, the Board appears to have found the new policies and procedures perfectly workable. Accordingly, we hold that the relief granted was appropriate and that the court order complied with the PLRA.

## D. Propriety of Injunction

On appeal, the Board asserts three principal objections to the propriety of the district court's injunction: that the Board has provided a legitimate penological justification for its actions (or inactions) under *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); that many of the claims against the Board were resolved in the settlement agreement between plaintiffs and the Department; and that Governor Davis and Secretary Presley are not properly subject to the injunction. We address each in turn.

### 1. *Turner v. Safley*

■ *Turner* holds that "when a prison regulation impinges upon inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Here, we are presented with policies and regulations of a state parole board which apply both to

---

**32.** Indeed, at oral argument, the Board stated that, should it prevail, it did not propose to change the new policies or procedures developed as a result of this lawsuit.

**33.** The injunction does not, for example, prescribe which Department or Board officials or employees may be delegated the function of determining when hearing impaired prisoners or parolees who must use sign language to communicate may be shackled at the hearing.

the inmates inside the prison and the parolees on the outside. While we have not yet considered whether *Turner* is limited to the prison context or whether it also applies to matters affecting parolees, certainly many of the reasons justifying prison authorities overriding prisoners rights disappear outside the prison walls.[34] *See Felce v. Fiedler*, 974 F.2d 1484, 1495–1496 (7th Cir.1992). However, we need not decide that issue for purposes of this appeal.

■ Assuming, without deciding, that *Turner* applies to all aspects of the case before us, we are required to determine whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. The Board has, however, repeatedly failed to adduce *any* justification, rational or not, for its ADA policy. For starters, it presents no justification that we can discern in its briefs. Equally surprising, the Board admitted at oral argument that we would find none in the record: it argued that such omission was immaterial so long as, even at that late stage of proceedings, "we can come up with any reason in our heads" that would justify its policies.[35]

■ To satisfy *Turner*, the Board must, at the very least, adduce some penological reason for its policy at the relevant stage of the judicial proceedings. "[C]onsiderations advanced to support a restrictive policy [must] be ... sufficiently articulated to permit meaningful ... review." *Walker v. Sumner*, 917 F.2d 382, 386 (9th

Cir.1990). Thus, at a minimum, the reasons must be urged in the district court. While the Board is correct that the burden rests with the plaintiff to refute the Board's defense that its actions were penologically justified, *see Frost v. Symington*, 197 F.3d 348, 357 (9th Cir.1999), that defense must at the very least be raised. Here, at oral argument, the Board for the first time referred obtusely to something about "cost" and "administrative" concerns without any explanation whatsoever as to how or in what respect the injunction implicated these matters. Certainly, it did not suggest that the unspecified costs and administrative concerns were any greater than those of any other agency subject to the ADA, or offer any reason why it should be exempted from the ordinary costs and burdens of complying with the ADA. We agree with the Seventh Circuit that prison authorities "cannot avoid court scrutiny [under *Turner*] by reflexive, rote assertions." *Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir.1996). In this case, the Board's unusual contentions did not even rise to that level, *see* n.35, *supra*. In short, the Board has failed totally to establish that the injunctive order in any way conflicts with *Turner*.

### 2. Control Over Department

The Board next argues that the injunction applies to parts of the original litigation already resolved by the settlement agreement, and is directed at facilities and individuals that are under the control of the Department. This objection does not

---

**34.** For example, many of the security interests relevant to the operation of a prison which provided *Turner*'s justification for abrogating prisoners' rights are absent in the context of the supervision of parolees' activities.

**35.** The Board suggested that the absence of penological justifications in the record was due to its being silenced on this point by the

district court. This assertion appears to be a fabrication. We find no evidence to support it in the record and the Board has identified none. Nor can we accept the remarkable proposition that the Board advanced at oral argument: that there were just too many justifications for it to include any particular ones.

properly apply to the parole revocation notification and hearing process. Prior to the hearing, the parolees are not incarcerated in facilities controlled by the Department, and notices may be served by any qualified persons designated by the Board. Moreover, parole revocation hearings need not be conducted at Department facilities. Because the Board can conduct the parole revocation process without using Department personnel or premises, the Board could readily comply with this aspect of the injunction without involving the Department's staff or facilities in any way.

■ The case of prisoners (and parolees whose parole has already been revoked) is different, however. The Department may in some instances require the Board to utilize Department staff or facilities when serving notice or conducting hearings on Department premises. We have identified three aspects of the injunction that must be construed or modified in a manner that will ensure that it does not order the Department to further modify its facilities, policies, or procedures,[36] or direct the Board to require the Department to do so (even assuming the Board had such authority).

### a. Department Facilities

Paragraph 6 of the injunction, which requires the Board to develop a transition plan in accordance with 28 C.F.R. § 25.150(d), mandates that the Board evaluate facilities in which parole proceedings are conducted; provide the Department of Corrections with a list of all facilities that are not fully accessible; and produce a schedule for providing accessible proceed-

ings for prisoners with disabilities at each facility. While most of paragraph 6 is unobjectionable, and simply requires the Board to inform itself as to which facilities, including Department facilities, provide accessible hearing rooms for mobility impaired prisoners or parolees, to the extent that it requires mobility impaired prisoners housed in Department facilities to be transported to alternative, accessible hearing locations, paragraph 6 may interfere with the Department's penological interest in securely confining certain prisoners. Accordingly, we construe this provision as requiring only that the Board request that the Department transport mobility impaired prisoners to accessible locations if the facilities at which they are housed are inadequate. The Department may, for valid security or other penological reasons, decline to do so.[37]

### b. Training of Department Personnel

Paragraph 14 of the injunction requires the Board to provide ADA training to its own staff, any attorneys it employs, and Department staff involved in the parole and parole revocation process. This portion of the injunction is designed to enforce 28 C.F.R. § 35.130(b)(1), which prohibits state entities from avoiding compliance with the act by delegating their services "through contractual, licensing, or other agreements." To the extent that paragraph 14 directs the Board to require Department personnel to undergo training, we agree with the Board's objection. Accordingly, we instruct the district court to modify the in-

---

**36.** As a result of the policies and practices developed in response to the settlement agreement, the Department is, apparently, already in substantial compliance with the ADA.

**37.** We note that, under the policies developed as a result of the settlement agreement with

the Department, mobility impaired prisoners are to be grouped at accessible facilities. Thus, there may in any event be no practical problem with respect to offering all mobility impaired prisoners hearings at accessible facilities.

junction as follows on remand: The Board shall provide training for all persons under its jurisdiction to the extent set forth in paragraph 14; it shall also offer training to Department staff involved in the parole and revocation process; should any Department personnel decline such training, the Board shall use its own personnel in their stead, except when the Department requires that Department employees perform the services involved.

### c. Tracking System

Paragraphs 15–18 of the injunction require that the Board establish a tracking system by which it can determine which inmates suffer from disabilities, and what their disabilities are.[38] The Board relies upon a prior decision of ours in the Department phase of this case, see *Armstrong v. Davis*, 215 F.3d 1332, 2000 WL 369622 (9th Cir.2000), in asserting that no tracking system is required. However, in our earlier opinion we did not reject the tracking requirement *per se*, but held that the tracking system proposed by the Department was "reasonably related to legitimate penological interests," and should not have been rejected by the district court. *See id.* Because the regulations implementing the ADA require a public entity to accommodate individuals it has identified as disabled, 28 C.F.R. § 35.104, some form of tracking system is necessary in order to enable the Board to comply with the Act. However, to the extent that tracking is conducted by the Department, it is not necessary for the Board to duplicate that system, and the Board may make use of the Department's tracking system as a permissible means of complying with the injunction.

### 3. Davis and Presley

 Governor Davis and Secretary Presley contend that they are not properly part of this portion of the lawsuit and that plaintiffs are barred from proceeding against them here by virtue of the settlement agreement entered into by the plaintiffs and the Department. A settlement is interpreted as any other contract, under the interpretive rules of the state. *Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994). The first step in contractual interpretation in California is to examine the text, Cal.Civil Code § 1638, and determine the intent of the parties. Cal.Civil Code § 1636. Here, the Governor and the Secretary rely on two parts of the settlement agreement. First, they point to the text, which states that: "This settlement does not resolve any issues between plaintiffs and the Board of Prison Terms or defendant Nielsen." Second, they rely on the inclusion in the settlement agreement of their names among the Department defendants. The two provisions on which they rely do not show that the agreement was intended to release Davis and Presley from the Board's portion of the case. The purpose of the provision of the settlement agreement quoted above was to make it clear that none of the issues regarding the *Board's* operations were to be affected by the *Department's* agreement. The fact is that the settlement agreement did resolve *some* issues involving Davis and Presley, because they, unlike Nielsen, have supervisory authority over the Department. Thus, it would have been erroneous to include their names in the quoted provision of the settlement agreement. As to the inclusion of Davis' and Presley's names on the list of Department defendants, their

---

**38.** The Board argues that the tracking system requires it to discover non-apparent disabilities possessed by disabled prisoners or parol-

ees. It does not. It simply requires the Board, once it becomes aware of such non-apparent disabilities, to keep track of them.

names were included because the two state officials have supervisory authority over the Department, and to the extent the claims against the Department were resolved, so were the claims against them. The claims against the Board were not resolved, however, nor were the claims against Davis or Presley that were based on their supervision of the Board. It is significant in this regard that there is no language in the settlement agreement providing that the Governor and the Secretary shall be dismissed as parties, or that all claims against them would be resolved by the agreement.

The simple fact is that the settlement agreement resolved only a portion of the issues between the plaintiffs and Davis and Presley, the two state officers who have jurisdiction over both the Department and the Board. While it might have been preferable to include a sentence stating explicitly that the Governor and the Secretary remain defendants in the instant portion of the lawsuit, such language was not essential. Thus, Davis and Presley properly remain parties to the litigation between the plaintiffs and the Board.

### E. Sovereign Immunity

■■■■ The defendants have not raised the issue of sovereign immunity in this case. Accordingly, any defendants to whom sovereign immunity might apply have waived that affirmative defense. Waiver of the sovereign immunity defense must typically be "stated by the most express language or by such overwhelming

implication" that the state's intent to waive is unambiguous. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 239–40, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Thus, mere appearance to defend a lawsuit will not act as a waiver, but "conduct during the litigation [that] clearly manifests acceptance of the federal court's jurisdiction or is otherwise incompatible with an assertion of Eleventh Amendment immunity" will be construed as a waiver. *Hill v. Blind Indus. & Servs. of Md.,* 179 F.3d 754, 759 (1999), amended by 201 F.3d 1186 (9th Cir.2000).[39] This is so because Eleventh Amendment immunity has traditionally been characterized as a "personal privilege which [the state] may waive at [its] pleasure," *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883), and although in the nature of a jurisdictional bar, it does not actually "implicate a federal court's subject matter jurisdiction in any ordinary sense" and thus may be "forfeited by the State's failure to assert it." *ITSI TV Prods., Inc. v. Agricultural Ass'ns.,* 3 F.3d 1289, 1291 (9th Cir.1993); *see also Wisc. Dep't of Corrs. v. Schacht,* 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) ("The State can waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it.").

■■■■ In *Hill,* we held that by actively litigating its case on the merits throughout the pre-trial period and waiting until the opening day of trial to assert a sovereign immunity defense, the state had waived that defense. 179 F.3d at 763. Here, the defendants engaged in litigation

**39.** *See also Torres v. Puerto Rico Tourism Co.,* 175 F.3d 1, 5 (1st Cir.1999) (defendant's failure to argue that a statute is an invalid abrogation of sovereign immunity until its reply brief on appeal is a waiver of that defense); *Garrity v. Sununu,* 752 F.2d 727, 731 (1st Cir.1984) (holding that a defendant's full acquiescence with a district court injunction and its failure to contest it on the merits on appeal is a waiver of a sovereign immunity defense in the appeal of fee awards); *New York State Ass'n. for Retarded Children v. Carey,* 596 F.2d 27, 39 (2d Cir.1979) (participation in a consent decree waives a sovereign immunity defense on an appeal contesting the district court's interpretation of that judgment).

conduct far more extensive than that of the defendant in *Hill.* The defendants did not assert sovereign immunity as a defense to this lawsuit in either of their amended answers, in the joint pretrial statement, in any pre-trial motions, at trial, or in the briefs on appeal.[40] Instead, they argued to the district court that their policies complied with the ADA, and on appeal that any violations of the ADA do not justify the relief granted.[41] Indeed, even though the defendants did not mention a sovereign immunity defense in their briefs, this court twice asked them to submit a letter brief about the effect of the Supreme Court's recent decision in *Board of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), on this case, but they declined to do so.[42] Consequently, the defense is waived.

■■■ Additionally, it is undisputed that the Rehabilitation Act applies in this case:

the acceptance of federal funds upon which the applicability of the Rehabilitation Act is conditioned serves to waive sovereign immunity with respect to the claims that arise under that Act. *See* 42 U.S.C. § 2000d–7; *Jim C. v. United States,* 235 F.3d 1079, 1082 (8th Cir.2000) (en banc) (holding that accepting funds pursuant to § 2000d–7 is a valid waiver of sovereign immunity); *see also generally College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 686–87, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions."). As we have noted (see n.17 *supra* at p. 861–62), the claims in this case are identical under the Rehabilitation Act and

---

**40.** In their answer to the original complaint, defendants asserted that they "have immunity guaranteed by the Constitution or Laws of the United States." However, in the subsequent answers to the amended complaints, and in the pretrial motion, this assertion is no longer made and there is no mention of any immunity defense. "[A]n amended pleading supersedes the original." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1546 (9th Cir.1989) (citations omitted); *accord Ferdik v. Bonzelet,* 963 F.2d 1258, 1262 (9th Cir.1992). This rules applies as much to amended answers as to amended complaints. *See Goldstone v. Payne,* 94 F.2d 855, 856 (2d Cir.1938); *see also District of Columbia, Dept. of Public Works v. L.G. Industries, Inc.,* 758 A.2d 950, 957 n. 6 (D.C.2000).

**41.** The Board contended at oral argument that it had somehow raised a sovereign immunity defense in the motion for summary judgment filed pursuant to the settlement agreement between the Department and the plaintiffs. However, the Board was not a party to either the settlement agreement or the motions filed pursuant to that agreement, and cannot rely upon either as raising that defense.

**42.** The state declined because, although "[t]he California Governor's office and high ranking state officials have engaged, and they will continue to engage, in consideration of the legal positions they may want to pursue regarding [*Garrett* ] [a] full consideration of this matter has been impossible because these officials have been immersed in matters related to California's current energy crisis." Shortly before the argument, we once again requested the state to advise us of its position regarding *Garrett* or the status of its efforts to determine its position. The state responded that "[t]he state officials with whom the Attorney General's office would need to consult on these issues have been devoting their time and resources to negotiations with the investor-based utilities [involved in California's energy crisis]." At oral argument, in response to a direct inquiry from the panel, the state continued to equivocate. We find this course of action bizarre and inexcusable. We do so without even considering the other activities the Governor was busily engaged in during the time in question. We also observe that it is now more than seven months since the date of oral argument and the state has still not accepted our invitation.

the ADA. Thus, the injunction would withstand a defense of sovereign immunity even if a suit against the Board under the ADA were barred.

Furthermore, *Garrett* makes clear that there is another, independent basis for the implementation of the injunction: there is no barrier to the injunction against Nielson in his official capacity as Secretary of the Board. *Garrett*, explicitly stated that "[o]ur holding here ... does not mean that persons with disabilities have no federal recourse against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by ... private individuals in actions for injunctive relief under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)." 121 S.Ct. at 968, n. 9. Because the injunction requires Secretary Nielsen to comply with its provisions, it would remain in force even if relief could not be ordered against the Board, and its effect would, for all practical purposes be the same. For the reasons set forth above, the state is not immune from suit. Moreover, the injunction would be effective as to Secretary Nielsen in any event.

## III. CONCLUSION

There is no dispute that the Board repeatedly violated the ADA and the Rehabilitation Act, and it is evident that the violations were system-wide. Plaintiffs have standing to seek a remedy for those violations. In most respects, the class-certification was appropriate. However, if plaintiffs seek to include, within the class, sexually violent predators, mentally disordered offenders, and prisoners or parolees with renal impairments, named plaintiffs must be added to represent those groups. Otherwise, the district court must modify the certification order and the injunction accordingly. We interpret paragraphs 6 and 15–18 of the injunction as permitting

the Department to object, for valid penological reasons, to the transportation of prisoners (including those facing parole revocation extension hearings) to alternative facilities, and as permitting the Board to use the Department's tracking system to comply with the injunction. We order that paragraph 14 be modified to the extent that it requires the Board to exercise control over Department personnel, and direct the district court to do so on remand. In all other respects the injunction is proper and its scope appropriate. It does not violate the provisions of the PLRA and is not inconsistent with *Turner v. Safley*. Sovereign immunity does not bar this action, and Governor Davis and Secretary Presley properly remain as defendants.

**AFFIRMED IN PART, VACATED IN PART, AND REVERSED AND REMANDED IN PART**

BERZON, Circuit Judge, concurring:

I fully concur in the opinion, but write separately about two related matters. First, the standing issue in this case is, I believe, somewhat more straightforward than the court's opinion may suggest. Second, it is useful to compare this case directly to *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court's most recent major pronouncement on the issuance of injunctions in prison cases. Doing so demonstrates that the injunction in this case suffers none of the standing or other defects that led the Court in *Lewis* to preclude equitable relief. Because the two points inform one another, I will discuss them together.

Standing is a jurisdictional issue. The court therefore must address standing, where questionable, even if the parties do not raise it. See, *e.g., Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). Here, the Bureau of Prison

Terms and its Chairman (BPT) did raise a standing issue, but on much more limited bases than the court's comprehensive discussion may suggest. I mention that not because I think the court is wrong to do a thorough job, but because the fact that the BPT, in its very complete presentations, did not raise at all some of the concerns the court discusses suggests that, as the court ultimately concludes, there is no merit to them.

I therefore find it helpful to begin the standing inquiry with the question the court addresses last but upon which the BPT concentrated in its rather brief presentations—namely, whether the individual named plaintiffs suffered an actual injury. If they did, then under *Hodgers–Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir.1999) (en banc), there is an Article III "case or controversy," and the question becomes whether the named plaintiffs have made a showing of a "real or immediate threat that the plaintiff[s] will be wronged again" adequate to maintain a claim for equitable relief. *Id.* at 1042, quoting *Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

The BPT maintains—fairly cursorily—that some of the named plaintiffs suffered no "legal injury", by which I presume BPT means that they suffered no Article III injury. Otherwise, the argument could not matter for standing purposes. One contention is that several of the named plaintiffs suffered no such injury because they never asked for an accommodation. But the question whether the provisions of Title II of the ADA assuring disabled individuals equal access to public programs are limited to those who request accommodation is a merits question, not one that affects whether the plaintiffs have suffered an injury *in fact*.

The BPT also suggests at points that the named plaintiffs lack standing because

they cannot show that the result of their parole proceedings would have been different had they been accommodated. A similar inquiry was central in *Lewis*, because *Lewis* involved a *constitutional* challenge based on a right of access to the courts. Given the basis for the lawsuit, the Court in *Lewis* concluded that only inmates who could demonstrate that the prison's failure to provide *some* means of accessing courts deprived them of the ability to litigate an arguable claim could show an actual injury. *Id.*, at 351–353, 116 S.Ct. 2174.

Here, however, the named plaintiffs are pursuing a *statutorily*-protected interest in *equal* access with other prisoners and parolees to parole-related BPT proceedings—a dignitary interest, so to speak. Further, the statute under which they are suing specifically protects disabled individuals' "participation" in "programs" of a public entity. Plaintiffs are alleging, in other words, that the ADA protects the right of disabled but otherwise "qualified" individuals to participate in their own parole hearings whether or not the result is affected, just as the same statute protects the right of disabled but otherwise "qualified" professional golfers to participate in tournaments even if they come in last and don't win a penny. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).

Another BPT contention is that because the California Department of Corrections (CDC) entered into a settlement with the plaintiff class regarding its own ADA violations, the plaintiffs have no continuing "legal injury" with regard to matters within the BPT's bailiwick that might be remedied by the CDC plan. There is, however, nothing in the present record regarding any actual relevant change of conditions due to the CDC plan. The matter is therefore more properly addressed, as the court addresses it, by adjusting the scope

of relief to cover only the BPT's involvement.

The BPT's fourth standing challenge concerns only the plaintiffs who were involved in parole revocation proceedings. BPT analogizes the plaintiffs' situation to that of ordinary citizens who seek to contest governmental conduct that *might* ensue *if* the plaintiffs break the law in the future, as in *Lyons* and *O'Shea v. Littleton*, 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). BPT argues that the parolee plaintiffs in this case cannot allege a credible threat of future injury sufficient to sustain a claim to equitable relief, because the possibility that they will participate in future parole revocation hearings depends on too many contingencies.

The court addresses that contention convincingly, showing that:

(1) Most importantly, many of the plaintiffs had already been subjected to multiple parole revocation proceedings, *compare Hodgers–Durgin*, 199 F.3d at 1045 (citizens stopped repeatedly by Border Patrol agents should be able to demonstrate the requisite likelihood of future injury, although plaintiffs stopped once in ten years could not).

(2) There are various critical differences between the situation of individuals subject to parole supervision and ordinary citizens as regards the likelihood of future involvement in liberty-threatening proceedings. These differences include the fact of mandatory, ongoing interactions with law enforcement officials, the fact that parole can be and often is revoked for reasons other than violations of criminal laws, and the absence of any probable cause requirement preceding a parole revocation hearing.

(3) There would be no further contingencies if plaintiffs were again threatened with parole revocation, because the absence of accommodation was established BPT policy.

Interestingly, *Lewis*, while expressing great concern to assure that only inmates who had suffered actual injury could obtain injunctive relief, appeared willing to assume the likelihood of future injury from actual injury in the past where the affected plaintiffs and class members remained within the corrections system and subject to its rules, regulations, and facilities. The Court did not ask whether the illiterate plaintiff who had his court case dismissed with prejudice because he had no assistance in bringing it was likely to have a claim dismissed again in the future for that reason. Instead, the Court held only that "[t]he remedy must ... be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* at 357, 116 S.Ct. 2174.

For all these reasons, the named plaintiffs in this case, like the two plaintiffs in *Hodgers–Durgin*, demonstrated that they have Article III standing to pursue this litigation. The questions then become (1) whether they have also established entitlement to equitable relief; and (2) if so, whether the scope of the relief granted is commensurate with the showing of injury suffered by the class.

It is critical to this case, in my view, that these two inquiries are not the same. While the prevalence of similar injuries among members of the class who are not named plaintiffs is not relevant to the first inquiry, *see Hodgers–Durgin*, 199 F.3d at 1045, the circumstances of class members are relevant to—indeed, of enormous importance to—the second inquiry, namely, the appropriate *scope* of any injunctive relief, as *Lewis* indicates. *See* 518 U.S. at 359–60, 116 S.Ct. 2174 (looking at all the state's prison facilities and at class members who were not named plaintiffs before concluding that there were only two in-

stances in which an illiterate inmate was unable to file a claim because he did not have assistance); *id.* at 360 n. 7, 116 S.Ct. 2174 ("[o]ur holding regarding the inappropriateness of systemwide relief for illiterate inmates does not rest upon the application of standing rules, but rather ... upon the respondents' failure to prove that denials of access to illiterate prisoners pervade the State's prison system.")[1] This consideration of class members' circumstances once standing and entitlement to equitable relief by named plaintiffs is established is commensurate with the general rule that once a court properly certifies a class action, "the unnamed persons described in the certification acquire[ ] a legal status separate from the interest asserted by the appellant." *Sosna v. Iowa,* 419 U.S. 393, 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *see also Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)[2]; *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

As to the inquiry whether the named plaintiffs here have established their own entitlement to equitable relief, the circumstances surveyed above with respect to those plaintiffs' Article III standing are determinative: The life prisoners have a likely recurring injury, because they may well have repeated parole suitability hearings and the record establishes that the BPT had an ongoing policy of not providing for the full participation of inmates with the named plaintiffs' communication, mental, and mobility disabilities. The parolees, for the reasons already discussed, are more in the situation of the inmates in *Lewis* than the free-roving citizens in *Hodgers–Durgin,* as they remain subject to the direct supervision and intervention of the criminal justice system even if they do not break any criminal laws. They therefore have a likelihood of recurring exposure to parole hearings, and to the BPT's legally deficient policies regarding their participation in those hearings.

Turning to the second question—whether systemwide relief was merited—it is here that the contrast with *Lewis* becomes most stark. The ADA, as noted, protects against exclusion from participation. In this case, therefore, unlike *Lewis,* it suffices that such denial of participation exists for each category of disability represented by the named plaintiffs as well as geographically across the system. Whether

---

**1.** The Court goes on in the same footnote quoted in the text to say that "The issue of systemwide relief has nothing to do with the law governing class actions." *Lewis,* 518 U.S. at 360 n. 7, 116 S.Ct. 2174. I take this statement to mean that the mere *existence* of a certified class covering prisoners throughout the system is not itself enough to justify systemwide relief. Rather, it is necessary to demonstrate that class members were injured in various institutions and with regard to the particular matters covered before a broad systemwide injunction is justified. Still, without the class, the individual plaintiffs would presumably be entitled only to injunctive relief regarding their personal situations, so the class does matter to that degree, as the consideration in the body of the *Lewis* opinion of the circumstances of non-named plaintiffs demonstrates.

**2.** *Gerstein* is particularly informative here, as it involved a challenge regarding pretrial detention hearings, somewhat similar in their function and time-span to parole revocation hearings. The court noted that even though the named plaintiffs were no longer in custody at the time the class was certified, "in this case the constant existence of a class of persons suffering the deprivation is certain," and, given the short-lived nature of any particular defendant's claim to an adequate hearing, "[t]he claim ... is one that is distinctly 'capable of repetition, yet evading review.'" 420 U.S. 103 at 111, 95 S.Ct. 854, 43 L.Ed.2d 54. The Court therefore allowed the case to go forward on a class basis, taking into account the separate interests of the members of the class.

or not there are inmates of each category throughout the system whose ability to attain or stay on parole was affected as a result does not matter. *Compare Lewis,* 518 U.S. at 350, 116 S.Ct. 2174 ("The foregoing analysis would not be pertinent here if, as respondents seem to assume, the right at issue—the right to which the actual or threatened harm must pertain—was the right to a law library or to legal assistance.") The plaintiffs have made this showing, through extensive individual and expert testimony, and, critically, *the BPT does not now challenge* as unsupported by the evidence any of the findings of the court regarding particular examples of ADA violations or the pervasiveness of its ADA violations throughout the system.

The BPT comes at the contention that the named plaintiffs should not have been permitted to attain relief directed at the class's injuries in another way as well, maintaining that the named plaintiffs should be allowed to represent only classes with their *particular* disabilities, and then only with regard to the type of hearing to which they were exposed. But there is no reason that a plaintiff cannot be typical— or present common issues—with regard to *both* the class of disability they have and the type of hearing they have experienced, independently.

Moreover, how a class is properly defined depends largely on the claim they seek to adjudicate. Here, the contention is that the BPT had a consistent policy of precluding meaningful participation in hearings for disabled prisoners and parolees generally, and for the particular classes of disabled prisoners and parolees represented by the named plaintiffs specifically. There are only so many forms of interaction between the prisoners and parolees and the BPT—written, oral, and physical. Whether a particular plaintiff

has dyslexia or another learning disability does not matter with regard to whether the BPT has in place means of accommodating prisoners or parolees who cannot read. In *Lewis,* for example, the Court treated two illiterate inmates as raising a common issue concerning adequate legal assistance without considering *why* each inmate could not read.[3] Similarly, whether a particular plaintiff is a paraplegic or has multiple sclerosis does not matter with respect to whether the BPT improperly conducts hearings in places inaccessible to mobility-impaired individuals.

If the challenge were to a discrete BPT policy of refusing to accommodate only certain disabilities within the groups of disabilities included in the certified class, the Bureau might have a point, but that is not the case. Similarly, if there were some asserted conflict or diversity of interests between discrete subgroups of disabled inmates or parolees relating to the causes of action asserted, the BPT might have a point, but that is not the case either.

There is one final comparison with *Lewis* that is worth making and that the court makes: The process the district court used here for devising a suitable remedial plan is precisely the kind of process *Lewis* indicates is appropriate. The court in this case issued essentially an umbrella injunction, setting forth the general areas— training, identification and accommodation, forms, equipment, the screening process, appeals, monitoring—that the BPT needed to address, and directing *the BPT* to develop specific policies and procedures for complying with the ADA. In accord with a directed negotiation process included in the injunction, the BPT has apparently responded to the plaintiffs' objections to their proposed plans satisfactorily to the

---

**3.** The Court went on for separate reasons to deny equitable relief.

plaintiffs, and a plan was achieved without further court intervention. The BPT has no problem with the practicalities of the plan, and intends to abide by it even if the injunction is vacated.

As the court reports, then, this was a minimally intrusive, not an "inordinately— indeed, wildly—intrusive" injunction (*Lewis*, 518 U.S. at 362, 116 S.Ct. 2174). It gave the major role in determining the new procedures to be put in place "to the views of state prison authorities." *Id.* It also bears noting, in light of any separation of powers concerns, that this injunction remedied a federal *statutory* violation. The court therefore had considerable guidance from Congress and from the federal executive branch in devising appropriate relief. Further, the court today has scrutinized the injunction carefully and, as noted, adjusted it with regard to the few instances in which it appears to impose unworkable burdens on the BPT.

For all these reasons, this case and *Lewis* are worlds apart, and the injunction in this case, as modified, was fully appropriate.[4]

---

4. I should note that I regard the question whether Governor Davis and Secretary Presley remain proper parties after the stipulation as closer than the court's opinion suggests. I nonetheless do not dissent from that holding because (1) there is in the "Stipulation . . . for Procedures to Determine Liability" no express release from liability, for the Governor and Secretary or anyone else; and (2) I cannot see why the two officials' presence or absence matters, as full relief can be obtained against the BPT and its Chairman, and the Governor and Secretary would have a duty as the Chairman's supervisors to see that he complies with any order against him.