**MULTI–ETHNIC IMMIGRANT WORKERS ORGANIZING NETWORK, et al.**

v.

**CITY OF LOS ANGELES, et al.**

No. CV 07–3072 AHM (FMOx).

United States District Court, C.D. California.

Dec. 14, 2007.

Attorneys Not Present for Plaintiffs.

Attorneys Not Present for Defendants.

**Proceedings:** IN CHAMBERS
(No Proceedings Held)

A. HOWARD MATZ, District Judge.

## I. INTRODUCTION

This is one of several civil rights actions arising from the Los Angeles Police Department's ("LAPD") forceful dispersal of the May 1, 2007 immigration rally at MacArthur Park. It is, of course, not surprising that such a momentous clash would spawn litigation, but because that event was so highly publicized, it has also triggered extensive commentary. The Court will not add to others' reflections about what May Day 2007 says about the City of Los Angeles. In this order the Court will only rule on the Plaintiffs' motion for class certification. For the following reasons, the Court GRANTS that motion.[1]

---

1. Docket No. 17.

## II. BACKGROUND

The LAPD recently issued a detailed report containing a minute-by-minute account of the events of May Day 2007 ("LAPD Report").[2] It is largely consistent with the factual allegations in the FAC. The events were also extensively captured on video. The following facts are evidently undisputed (unless otherwise noted).

On May 1, 2007, an association of five non-profit organizations comprising Plaintiff Multi-Ethnic Immigrant Workers Organizing Network ("MIWON") conducted a march and rally, as they had done previously on "May Day" for several years. FAC ¶ 50. The permitted events consisted of a morning march and rally in downtown Los Angeles[3] and a final rally at MacArthur Park. LAPD Report at 7. The MacArthur Park rally was permitted to continue until 9:00 p.m. FAC ¶ 6. By 5:00 p.m., an estimated 6,000 to 7,000 people were present in or around MacArthur Park. LAPD Report at 7. A number of events created tensions among demonstrators and police.[4] In the immediately precipitating incident, a group of 20 or 30 "anarchist kids" began throwing objects at the police, including water bottles and gravel. LAPD Report at 8, 32–33.

As officers in the field radioed in reports that they were "taking rocks and bottles" and that unruly elements were inciting the crowd, two groups of supervising officers discussed plans to disperse the crowd. LAPD Report at 33–34. Despite some miscommunication along the chain of command, the discussions resulted in "a decision to declare an unlawful assembly and disperse the crowd." LAPD Report at 8. "[The] plan involved the use of Metropolitan Division [an elite LAPD unit] resources to move the crowd from the south side of the park northbound from 7th and Alvarado toward the north side of the park." *Id.* The LAPD commanders also gave authorization to use "less-lethal" munitions if the behavior of the crowd warranted it. *Id.* at 34–35.

"At 6:17 p.m., the Metropolitan Division B–Platoon formed a skirmish line, and without a dispersal order being given, moved the crowd northbound, pushing and striking some individuals in the crowd, including some members of the media, and firing less-lethal munitions." *Id.* at 8; FAC ¶ 7. A few minutes later, a police helicopter broadcast a partial dispersal order: "This is the Los Angeles Police Department. (Inaudible) ... This is now an unlawful assembly. Everybody needs to leave the park immediately." LAPD Report at 38. This order was broadcast in English and was inaudible to many in the park, including certain LAPD commanders, who in the next ten minutes sought confirmation that an order had been given. *See* LAPD Report at 40; FAC ¶ 7. By 6:41 p.m., when the LAPD drive to clear the park ended, "officers had driven thousands of people from the park, knocked over and struck some individuals—including media and non-media, peaceful or not—and deployed a total of 146 less-lethal impact munitions and over 100 uses of the baton." LAPD Report at 9.

As a result of the LAPD's forceful dispersal of the rally, MIWON, its five member organizations, and twelve individuals filed this putative class action against the City of Los Angeles, William Bratton (the Chief of Police), Cayler Carter (Deputy Chief of Police), Louis Gray (an LAPD commander), and Does 1 through 10. A group of attorneys from over a dozen law firms ("MIWON counsel") jointly represent the named plaintiffs as well as a large number of unnamed plaintiffs, totaling over 180 people. Plaintiffs seek appointment of the twelve named individual plaintiffs as class representatives and appointment of MIWON counsel as class counsel.

---

2. Plaintiffs' Request for Judicial Notice, Los Angeles Police Department Report to the Board of Commissioners, An Examination of May Day 2007 (Oct. 9, 2007), Reply Ex. A. Available at http://www.lapdonline.org/home/pdf_view/36560 (last visited Dec. 14, 2007).

3. The LAPD Report states that the morning events took place in "Central Area," which is an LAPD designation for downtown Los Angeles. MacArthur Park is in the "Rampart Area."

4. For example, at one of the entrances to the park, the police formed a skirmish line to direct the crowd into a particular entrance, thereby raising tensions with the crowd. LAPD Report at 8.

The First Amended Complaint ("FAC") contains seven claims seeking relief for violations of various rights:

1. Freedom of speech and association, pursuant to the First and Fourteenth Amendments, and 42 U.S.C. § 1983;

2. Equal protection, pursuant to the First and Fourteenth Amendments, and 42 U.S.C. § 1983;

3. Right to be free from excessive force, pursuant to the Fourth and Fourteenth Amendments, and 42 U.S.C. § 1983;

4. Due process, pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983;

5. Right to be free from threats, intimidation or coercion under California Civil Code § 52.1;

6. Right to be free from violence or intimidation under California Civil Code § 51.7; and

7. Right to be free from assault and battery.

The organizational plaintiffs seek only injunctive relief. The individual plaintiffs seek compensatory, statutory and exemplary damages, and injunctive relief individually and as class representatives.

Plaintiffs initially moved to certify the following two classes under Rule 23(b)(2) and 23(b)(3):

(1) An injunctive class defined as "all persons who in the past, or may in the future, engage in peaceful demonstrations or protest in the City of Los Angeles."

(2) A damages class defined as "those persons who were present on May 1, 2007 in or around MacArthur Park at any point between the hours of 5:00 and 7:00 p.m., who did not engage in any conduct justifying Defendants' dispersal order or the use of force, and who were subjected to the LAPD's use of force, dispersal order or other unlawful police activity in MacArthur Park, or along Wilshire Boulevard, Alvarado Boulevard, 7th Street or Park View Street, or in the vicinity of those streets."

At a hearing conducted on October 29, 2007, the Court pointed out various problems with the proposed class definitions. Those problems related primarily to whether the proposed class representatives had standing to pursue the injunctive class and whether the proposed damages class was sufficiently discrete and manageable to warrant certification. Following the hearing, Plaintiffs modified their proposals and now they propose these classes:

(1) An injunctive class defined as: "Those who in the past have engaged in or who in the future may engage in peaceful demonstrations or protest in the City of Los Angeles and who, at the time they engage in such peaceful demonstrations or protest, were or are:

(a) The following organizations: Multi–Ethnic Immigrant Workers Organizing Network, Coalition for Humane Immigrant Rights of Los Angeles, Koreatown Immigrant Workers Alliance, Institute for Popular Education of Southern California, Pilipino Workers Center, Garment Workers Center ("Plaintiff Associations");

(b) Officers, representatives, or members of Plaintiff Associations;

(c) Persons who attend or participate in Plaintiff Associations' events, including but not limited to their rallies;

(d) Persons who attend or participate in Plaintiff Associations' events, Organizations who advocate and/or organize on behalf of the rights of individuals and associations to engage in speech, assembly, and expression within the scope of the First Amendment of the United States Constitution."

(2) A damages class defined as: "Those persons who were present on May 1, 2007 in the geographic area bounded by 6th Street (on the north), Alvarado Street (on the east), 7th Street (on the south), and Park View Street (on the west), or the immediately adjacent areas, including along 6th Street to Lafayette Park, at any point between the hours of 5:00 and 7:00 p.m., who did not engage in any conduct justifying Defendants' dispersal order or the use of force, and who were subjected to the LAPD's use of force, dispersal order or other unlawful police activ-

ity arising from the police response to the immigration march and rally."

## III. LEGAL STANDARD

The party seeking class certification bears the burden of establishing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. *Dukes v. Wal–Mart, Inc.,* 509 F.3d 1168, 1177, 2007 WL 4303055 *4 (9th Cir., Dec. 11, 2007) (citing *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1186 (9th Cir.2001), *amended,* 273 F.3d 1266 (9th Cir.2001)). A district court may certify a class only if, after "rigorous analysis," it determines that the party seeking certification has met its burden. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 158–161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). However, in determining whether plaintiffs have carried their burden, the court may not consider the merits of their claims. *See Dukes,* 509 F.3d at 1177, 2007 WL 4303055 at *4. Rather, in reviewing a motion for class certification, the Court generally is bound to take the substantive allegations of the complaint as true. *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.,* 691 F.2d 1335, 1342 (9th Cir.1982) (citing *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975)). Nevertheless, the Court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992) (citation omitted). In fact, "courts are not only at liberty to but *must* consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case." *Dukes,* 509 F.3d at 1177, 2007 WL 4303055 at *4 (internal quotations and citation omitted). Ultimately, it is within the district court's broad discretion to determine whether a class should be certified. *Id.* at 1176.

## IV. DISCUSSION

### A. Standing

A party cannot be a proper representative of a class if such party lacks standing individually to pursue the claims of the class. *Haw-*

*kins v. Comparet–Cassani,* 251 F.3d 1230, 1238 (9th Cir.2001).

■ To have Article III standing to seek injunctive relief on behalf of a class, a named plaintiff must have suffered harm constituting "actual injury." *Armstrong v. Davis,* 275 F.3d 849, 860–61 (9th Cir.2001) (internal citations omitted) (citing *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), *Lewis v. Casey,* 518 U.S. 343, 348–49, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), and *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). There is no dispute that the individual Plaintiffs have alleged actual and direct injury— being driven out of a public park and surrounding areas, as well as physical injury. Each Plaintiff has alleged that he (or she) was present at MacArthur Park as a demonstrator, observer of the rally, or recreational user of the park at the time of the forceful dispersal, and that he (or she) suffered physical injury due to the LAPD's use of force. FAC ¶¶ 40, 56–67.

■ But a class representative plaintiff also "must demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *Armstrong,* 275 F.3d at 860–61 (quoting *Lyons,* 461 U.S. at 109, 103 S.Ct. 1660). Defendants argue that Plaintiffs do not face a real and immediate threat of being prevented by the LAPD from participating in a lawful and peaceful demonstration in the future.

Nine of the twelve individual Plaintiffs have submitted declarations making it clear that they frequent MacArthur Park and other public areas, whether for demonstrations or recreation, and intend to do so in the future. *See* Reply Ex. B (Declarations of Breslin, Cuellar, Eng, Galvez, Gomez, Maldonaldo, Ortiz, Pedro and Rothe–Kushel). Breslin, Gomez, Galvez, and Ortiz submitted supplemental declarations after the hearing indicating that they also attended the May Day 2006 rally. Pls.' Supp. Mem. Exs. A–D. Defendants do not dispute that those Plaintiffs who have submitted supporting declarations are likely to attend demonstrations in the future. They argue only that the LAPD's behavior will not occur again.

One way to meet the "realistic repetition" requirement is to "demonstrate that the harm is part of a 'pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights.'" *Armstrong*, 275 F.3d at 861 (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir.1985)). As the Ninth Circuit elaborated, "where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the 'realistic repetition' requirement." *Armstrong*, 275 F.3d at 861; *see also Thomas v. County of Los Angeles*, 978 F.2d 504, 507 (9th Cir.1992) (noting that the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.") (citation omitted).

The LAPD has issued unlawful dispersal orders and displayed excessive force orders against demonstrators in the past. Some of the incidents are documented in lawsuits, such as the Los Angeles Superior Court cases *Marmillion v. City of Los Angeles* (BC 059778), arising out of a large demonstration in October 1991; and *Vassos v. City of Los Angeles* (BC 080155) and *Shefik v. City of Los Angeles* (BC 080092), arising from mass arrests of protesters in 1992. Declaration of Carol A. Sobel in Support of Plaintiffs' Supplemental Memorandum ("Sobel Supp. Decl.") ¶¶ 2, 4. *Vassos* and *Shefik* ended in a combined settlement agreement in 1995, involving monetary payment as well as LAPD policy changes and training requirements. *Id.* ¶¶ 5–6 & Ex. C. Notably, that settlement included provisions defining an unlawful assembly, distinguishing an unlawful assembly from unlawful conduct by isolated individuals, and setting forth requirements for dispersal orders. *Id.*, Ex. C, ¶¶ 10, 12, 14.

At the Democratic National Convention in 2000, the LAPD declared an unlawful assembly in the public demonstration area, ordered the crowd to disperse, and used rubber bullets, batons and other forms of physical force as the crowd attempted to disperse. That mêlée led to three federal lawsuits in this District: *National Lawyers Guild v. City of Los Angeles* (CV 01–6877) ("*NLG*"), *Berg v. City of Los Angeles* (CV 01–7046), and *Crespo v. City of Los Angeles* (CV 00–8869). The *NLG* and *Crespo* cases ended in settlements that set forth standards for the LAPD in regards to unlawful assemblies, dispersal orders, and treatment of the media. *See* Mem. Ex. 37 (Settlement agreement in *NLG*) ("*NLG* Settlement"); LAPD Report, Appendix A, p. 85 (summary of standards from *NLG* and *Crespo* settlement agreements).

The Court in *NLG* found that plaintiffs had established sufficient likelihood of repetition to have Article III standing to seek equitable relief, citing numerous demonstrations at which the LAPD allegedly acted unlawfully. Sobel Supp. Decl., Ex. E (Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment at 12–13 (CV 01–6877, Dec. 3, 2003)).

The LAPD itself has acknowledged that what happened on May Day 2007 was not an isolated incident: "Chief Bratton was concerned that the Department had identified many of these problems in the past and that the lessons learned had been forgotten." LAPD Report at 74. The LAPD Report also acknowledges that the treatment of the media at May Day 2007 failed to comply with the *NLG* and *Crespo* settlement agreements. LAPD Report at 10, 11, 48. The Report further identified a number of reasons for the repetition on May Day 2007 of the kind of police misconduct that occurred at the Democratic National Convention some seven years earlier. For example, it noted: "Over the past several years, there appears to have been a gradual diminution of an arrest posture during organized crowd control situations. The Department has moved from a posture of isolating and arresting those who are engaging in unlawful activity or disrupting a rally or demonstration, to a posture of declaring an unlawful assembly and clearing the entire area." *Id.* at 52. The report also faulted the scaling back of training in crowd control and treatment of the media, suggesting it was "non-required" training that was "not a priority," given other demands on LAPD resources. *Id.* at 63–64.

In short, May Day 2007 was not an isolated event caused by unusual or isolated factors.

The injunction that Plaintiffs now seek generally mirrors the standards set forth in

the *NLG* Settlement and incorporates the principles from the *Vassos–Shefik* settlement. *See* Mem. Ex. 37; Sobel Supp. Decl., Ex. C. Indeed, the LAPD Report explicitly recognizes that standards in the *NLG* and *Crespo* settlements apply. LAPD Report Appendix 1 (Summary of the measures that the LAPD agreed to enact as part of the settlements resulting from the 2000 Democratic National Convention). However, those settlements were private agreements, not consent decrees or court injunctions. Moreover, some of the settlement language was permissive, lacking the precision and force of a legal decree. For example, the *NLG* Settlement provided that the LAPD *may* use less-lethal weapons under certain circumstances, rather than that the LAPD is *prohibited from* using those weapons *except* under certain circumstances. *See* Mem. Ex. 37 at 4. So if an injunction were to ensue in this case, it probably would have a greater likelihood of compliance.

Defendants argue that the LAPD already has institutionalized the policies and training needed to prevent a recurrence of the misconduct that took place on May Day. They declare that they "can now provide assurance that the alleged misconduct of May 1, 2007 will not occur in the future." Def. Resp. to Pls.' Supp. Mem. at 2. Defendants cite to the LAPD Report's description of the Incident Management and Training Bureau, established in July 2007, the institution of Department-wide training in crowd control and First Amendment issues, and several examples of successful LAPD management of mass demonstrations since May 2007. *Id.,* Hillman Decl. ¶¶ 1–8. Defendants also emphasize that historically there have been more events and rallies with no LAPD misconduct than those with problems, pointing to May Day 2006 as an example of a very similar demonstration that was successful. *Id.* ¶ 9.

Defendants' showing is insufficient to deny Plaintiffs standing to seek injunctive relief. In the past, the LAPD has undertaken efforts to revise its policies and train LAPD officers to ensure proper management of demonstrations, albeit those efforts were not as extensive as the post-May Day 2007 efforts are touted to be. *See* Sobel Supp. Decl. ¶ 6 & Ex. C ¶¶ 7–17 (policies and training changes as part of the *Vassos–Shefik* settlement). Although steps were taken in the immediate aftermath of previous litigation, nevertheless new instances of misconduct occurred. The Court cannot find that the measures the LAPD took after May 2007 have achieved, in a mere six months, the reforms that plaintiffs in previous cases sought for over a decade.

Defendants' contention that their overall record of complying with constitutional requirements relating to crowd control is more positive than negative is similarly unpersuasive. Defendants suggest that Plaintiffs lack standing because the LAPD's record with regards to May Day immigration rallies is "1 and 1"—*i.e.,* as successful in 2006 as it was unsuccessful in 2007. Def. Resp. at 3. This argument actually hurts Defendants: if the odds of an alleged constitutional violation recurring were 50 percent, a sufficient case or controversy would be present.

In any event, to establish a case or controversy Plaintiffs need not establish that future harm is certain, or even probable. What they must establish is that recurrence is not "conjectural" or "hypothetical," as it would be if future injury were contingent on multiple unlikely assumptions. *See Lyons,* 461 U.S. at 105–08, 103 S.Ct. 1660 (threat of future injury not sufficiently real and immediate to establish existing controversy where the claim of future injury rested on assumption that plaintiffs would engage in conduct leading to an encounter with police involving the use of a chokehold). Given Plaintiffs' declarations, the contents of the LAPD Report and the unfortunate history of civil rights violations by LAPD officers,[5] it is clear that here the threat of future injury is not merely conjectural or hypothetical. Although the Court applauds the LAPD's remedial actions since May Day 2007, the

---

**5.** *See* Report of the Independent Commission on the Los Angeles Police Department (1991) (the "Christopher Commission Report"); Consent Decree, *United States v. City of Los Angeles* (CV 00–11769, June 19, 2001) (settlement of lawsuit brought by Department of Justice for systematic violations of civil rights).

Court finds that the individual Plaintiffs are "realistically threatened by a repetition of [the violation.]" *Lyons* at 109, 103 S.Ct. 1660.

This conclusion is consistent with *Lyons* and Ninth Circuit precedent. In *Hodgers–Durgin v. De La Vina,* a case which Defendant cites, the Ninth Circuit distinguished *Lyons* on the ground that in *Lyons,* the police chokehold that was the alleged injury occurred during a traffic stop prompted by Lyons's misconduct. 199 F.3d 1037, 1041–42 (9th Cir.1999) (*en banc*) (stating that the Supreme Court in *Spencer v. Kemna,* 523 U.S. 1, 15, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) "characterized the denial of Article III standing in *Lyons* as having been based on the plaintiff's ability to avoid engaging in illegal conduct."). The plaintiffs in *Hodgers–Durgin* had standing to challenge the Border Patrol's practice of stopping motorists without reasonable suspicion because driving vehicles near the Mexican border is innocent conduct and therefore they had no duty to avoid another stop by the Border Patrol. *Id.* at 1041. Moreover, there was "no string of contingencies necessary to produce an injury." *Id.* at 1042–43. This case is like *Hodgers–Durgin* and not like *Lyons* for the same reasons. Plaintiffs claim that they were engaged in innocent conduct when they were unjustifiably driven from MacArthur Park and surrounding areas. Like the plaintiffs in *Hodgers–Durgin,* they are neither able to nor required to prevent the possibility of that injury being repeated.

## B. Adequacy of Class Definitions

Rule 23 requires that a class be defined. *See Board of School Commissioners of City of Indianapolis v. Jacobs,* 420 U.S. 128, 130, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (finding error in district court's failure to identify a class). However, the contours of the class need not be so clear that every potential member may be identified at the time of class certification. *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780 (9th Cir.1986). Rather, "a class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individ-

ual is a member." *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998) (citing *Aiken v. Obledo,* 442 F.Supp. 628, 658 (E.D.Cal.1977)); Manual for Complex Litigation (Fourth) § 21.222 (2004).

Based on the proposals the Court circulated at the hearing and the minor modifications Plaintiffs suggested in their supplemental brief, the Court will certify the following classes:

### 1. Damages class definition.

"Those persons who were present on May 1, 2007 in the geographic area bounded by 6th Street (on the north), Alvarado Street (on the east), 7th Street (on the south), and Park View Street (on the west), or the immediately adjacent areas, including from 6th Street west to Lafayette Park, at any point between the hours of 5:00 and 7:00 p.m., who did not engage in any conduct justifying Defendants' dispersal order or the use of force, and who were subjected to the LAPD's use of force, dispersal order or other unlawful police activity arising from the police response to the immigration march and rally."

### 2. Injunctive class definition.

"Those who in the past have engaged in or who in the future may engage in peaceful demonstrations or protest in the City of Los Angeles and who, at the time they engage in such peaceful demonstrations or protest, were or are:

(a) The following organizations: Multi–Ethnic Immigrant Workers Organizing Network, Coalition for Humane Immigrant Rights of Los Angeles, Koreatown Immigrant Workers Alliance, Institute for Popular Education of Southern California, Pilipino Workers Center, Garment Workers Center ("Plaintiff Associations");

(b) Officers, representatives, or members of Plaintiff Associations;

(c) Persons who attend or participate in Plaintiff Associations' events, including but not limited to their rallies;

(d) Organizations that advocate, organize, or both advocate *and* organize on behalf of the rights of individuals and associations to engage in speech, assembly, and expression

within the scope of the First Amendment of the United States Constitution.

(e) Persons who participate in public assemblies organized by the organizations described in paragraph (d)."

Defendants object that the size of this injunctive class is open-ended and without temporal limit (*i.e.*, it could include persons who first became eligible for class membership only after the class was certified). They also contend that the terms "peaceful" and "demonstration" are not defined. Finally, they argue that class membership cannot be objectively determined, because it would turn on each potential class member's state of mind. Not so.

■ As a general matter, less precision is required of class definitions under Rule 23(b)(2) than under Rule 23(b)(3), where mandatory notice is required by due process. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (holding that notice of right to opt-out of suit for money damages is required by the Due Process Clause); *Yaffe v. Powers,* 454 F.2d 1362, 1366 (1st Cir.1972) (stating that in contrast to certification of a subdivision (b)(3) class, "notice to the members of a(b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited."). Manageability is not as important a concern for injunctive classes as for damages classes. *See Elliott v. Weinberger,* 564 F.2d 1219, 1229 (9th Cir.1977) ("by its terms, Rule 23 makes manageability an issue important only in determining the propriety of certifying an action as a(b)(3), not a(b)(2), class action."), *aff'd in pertinent part sub nom. Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

■ Defendants' objection to the lack of a temporal limit lacks merit. Indeed, the very nature of an injunctive class contemplates that there will be class members who can only be determined in the future. *See Probe,* 780 F.2d at 780; *see also Carpenter v. Davis,* 424 F.2d 257, 260 (1st Cir.1970) (approving injunctive class consisting of all who wish or expect to write for, publish, sell or distribute the newspaper in the future and emphasizing that "[t]he record is ample to show numerous such people in existence, as well as the probability of others who may become members of the class in the future."). Any temporal limit on the injunctive class in this case would be arbitrary.

■ Although class definitions should avoid criteria that are subjective, the words "peaceful" and "demonstration" are objectively determinable descriptors of class members' behavior. Other courts have certified a class defined with similar language. *See, e.g., Washington Mobilization Committee v. Cullinane,* 400 F.Supp. 186, 218 (D.D.C. 1975), *rev'd in part on other grounds,* 566 F.2d 107 (D.C.Cir.1977) (certifying class of "all persons who have participated in or observed and who intend to participate in or observe lawful, peaceful, orderly and nonobstructive public demonstrations for the exercise of their Constitutional rights of free speech and assembly"); *Medrano v. Allee,* 1972 WL 714, *3 (S.D.Tex. Dec. 4, 1972), *vac'd in part on other grounds, Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).

■ This case is distinguishable from cases in which the class definition depended on the states of mind of class members or defendants, such as *Vietnam Veterans Against the War v. Benecke,* 63 F.R.D. 675, 679–80 (W.D.Mo.1974). There, like here, plaintiffs alleged that the police deprived them of their right to assemble peacefully when their protest march was cut short. *Id.* at 677. The proposed class definition encompassed "persons who attend or participate or who wish to attend or participate in any public assembly or demonstration in Kansas City, Missouri held by citizens groups or organizations whose political or social views conflict with those of the officials in the government or the Kansas City, Missouri Police Department." *Id.* at 678. This definition, the court held, was insufficient for determining membership in the class, because it was "based upon such a general and indefinite state of mind, encompassing a kaleidoscopic variety of mental positions...." *Id.* at 680. Similarly, in *Koen v. Long,* a class consisting of people belonging to organizations that are unpopular with defendants, and who participate in activities which are

"controversial and unpopular with defendants" was found to depend on the state of mind of defendants, and therefore inadequate. 302 F.Supp. 1383, 1387–89 (E.D.Mo. 1969), *aff'd* 428 F.2d 876 (8th Cir.1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 827 (1971).

Unlike those cases, membership in the injunctive class proposed here does not depend on the beliefs or state of mind of any individuals. Rather, membership is based on the putative class members' conduct, activities, and affiliations. These criteria are readily susceptible to judicial determination. *See Alliance to End Repression v. American Civil Liberties Union*, 565 F.2d 975, 978 (7th Cir.1977) (holding that the injunctive class was adequately defined because its scope is defined by the activities of the defendants with no particular state of mind required).

## C. Rule 23(a) Requirements

### 1. *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). *Dukes*, 509 F.3d at 1177, 2007 WL 4303055 at *4. The damages and injunctive classes indisputably meet this requirement.

 Based on the LAPD's estimates of turnout, Plaintiffs logically estimate the damages class to include over 6,000 people.[6] As the LAPD Report confirmed, only a very few people were disobedient or disorderly (or attacked the police), and therefore potentially ineligible. Given these estimates, the damages class meets the numerosity requirement.

Defendants' objection to Plaintiffs' vague estimate of the size of the injunctive class is not well taken. Rule 23 does not require a numeric estimate of the number of class members, if certification under Rule 23(b)(2) is sought. *See* Advisory Committee Notes, 39 F.R.D. 69, 102 ("Illustrative [of 23(b)(2)] are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose

members are *incapable of specific enumeration.*") (emphasis added).

### 2. *Commonality*

 Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998).

The LAPD's command decisions to declare an unlawful assembly, disperse the crowd, and authorize the use of force constitute the "common core of salient facts" that support commonality. *See* FAC ¶¶ 77, 78 (listing common questions of law and fact). Defendants do not challenge any of these commonalities. Accordingly, the Court finds that there are sufficient shared factual and legal issues to satisfy Rule 23(a)(2).

### 3. *Typicality*

 Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The typicality requirement "is designed to assure that the named representative's interests are aligned with those of the class." *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1321 (9th Cir.), *vacated and remanded on other grounds*, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). Where such an alignment exists, a representative who vigorously pursues her own interests will necessarily advance the interests of the class. *Id.* The Ninth Circuit interprets the typicality requirement permissively. *Hanlon*, 150 F.3d at 1020. Named plaintiffs' claims need not be identical to the claims of the class; rather, their claims are typical if they are "reasonably coextensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. "As

---

**6.** The LAPD Report estimates that 6,000 to 7,000 were present in MacArthur Park at 5:00 p.m. The damages class is comprised of those present in

the park or immediately adjacent areas between 5:00 and 7:00 p.m.

long as the named representative's claim arises from the same event, practice, or course of conduct that forms the basis of the class claims, and is based upon the same legal theory, varying factual differences between the claims or defenses of the class and the class representative will not render the named representative's claim atypical." *Jordan,* 669 F.2d at 1321.

All of the proposed representatives claim they were driven from the park, all claim physical injury and some claim to have had physical contact with the police. Defendants nevertheless argue that typicality is lacking because the May Day incident gave rise to *different* rights, injuries, and claims, depending on whether one was a participant, legal observer, or bystander, whether one heard the dispersal order, whether one had physical contact with the police, and whether one suffered physical injury. Plaintiffs correctly respond that one's status as participant, observer or bystander does not defeat typicality as to their First Amendment claim, because that claim alleges that *everyone* had a First Amendment right to be in the park. Similarly, one's right to be free from excessive force does not depend on whether one was participating in the protest. Nor do differences in physical contact and injury defeat typicality as to the Fourth Amendment claim, because they are permissible variations within a class. *See Vodak v. City of Chicago,* 2006 WL 1037151 at *6 (N.D.Ill. 2006) (similar variations in arrest and detention within large group of protesters did not defeat typicality). As the Ninth Circuit noted in *Hanlon,* "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." 150 F.3d at 1020. Under these standards, the proposed representatives' claims are typical.

### 4. Adequacy of representation

■ The adequacy requirement of Rule 23(a) is that the "representative parties will fairly and adequately protect the interests of

the class." Fed.R.Civ.P. 23(a)(4). This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed classes, and (2) that Plaintiffs are represented by qualified and competent counsel who will prosecute the action vigorously on behalf of the class. *Dukes,* 509 F.3d at 1185–86, 2007 WL 4303055 at *11 (citations omitted). The declarations of Plaintiffs and their counsel satisfy these requirements. Defendants' only argument regarding adequacy is that the class representatives lack standing to seek an injunction. The Court rejected that argument, above.

(a) Class representatives.

Plaintiffs request that the twelve individually named plaintiffs be appointed class representatives. The Court will appoint as class representatives only those named plaintiffs who have filed declarations attesting to their understanding of their obligations as class representatives. They are: Kevin Breslin, David Gabriel Eng, Luis Galvez, Gerardo Gomez, Jaime Maldonado, Leopoldo Ortiz, Romualdo Pedro, and Jeremy Rothe–Kushel.[7]

(b) Class counsel and steering committee.

The Court appoints Barrett Litt, Carol Sobel and Paul Hoffman as lead class counsel. Those attorneys who filed actions on behalf of other clients who agree to be members of the damages class may serve on a steering committee.

### D. Rule 23(b)(2) Requirements

■ Certification under Rule 23(b)(2) is appropriate where the opposing party "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Originally designed for civil rights cases, Rule 23(b)(2) class actions are limited to those class actions seeking primarily injunctive or corresponding relief. *Newberg on Class Actions,* § 4.11 (4th ed.2002).

---

**7.** Each of these eight individuals has submitted a second declaration with the Reply in support of their standing to represent an injunctive class.

Four of these individuals, Breslin, Gomez, Galvez, and Ortiz, submitted a third declaration after the hearing in support of their standing.

Other courts have certified Rule 23(b)(2) classes in cases involving police action against demonstrators. *See Chang v. United States,* 217 F.R.D. 262, 264, 267 (D.D.C.2003) (certifying a class of persons arrested *en masse* during an anti-World Bank/IMF protest in September 2002 in Washington D.C.); *Washington Mobilization Committee v. Cullinane,* 400 F.Supp. 186, 219 n. 2 (D.D.C. 1975); *Sullivan v. Murphy,* 478 F.2d 938, 967 (D.C.Cir.1973) (noting class treatment was appropriate, despite the highly individualized nature of probable cause, because it was "a situation in which the police did not govern themselves by their ordinary procedures ... And the arrests that were made were the product of a common course of conduct by the police."); *Sullivan v. Murphy,* 380 F.Supp. 867, 868 (D.D.C.1974).[8]

### 1. *Act or refusal to act.*

The mere fact that the LAPD declared an unlawful assembly and dispersed the crowd at MacArthur Park is enough to meet the requirement that defendants acted on grounds generally applicable to the class. Moreover, Plaintiffs have alleged (and at this stage the Court must accept as true) that the LAPD has failed to adopt and/or implement policies to prevent the infringement of the rights of demonstrators. *See* FAC ¶¶ 28–39. That Defendants have "acted or refused to act on grounds generally applicable to the class" is patently obvious based on the LAPD Report and the allegations at the heart of this lawsuit.

### 2. *Impact of money damages on injunctive class certification.*

The Ninth Circuit recently reiterated that Rule 23(b)(2) class actions can include claims for monetary damages, so long as such damages are not the "predominant" relief sought, but instead are "secondary to the primary claim for injunctive or declaratory relief." *Dukes,* 509 F.3d at 1186, 2007 WL 4303055 at *11 (internal quotations and citations omitted). Moreover, "the predominance test

turns on the primary goal of the litigation— not the theoretical or possible size of the damage award." *Id.* at 1187.

Plaintiffs seek compensatory and special damages, damages pursuant to California Civil Code § 52, and exemplary damages "in an amount sufficient to deter and to make an example of [ ] defendants." FAC ¶¶ 118–120. The Court should not and will not speculate as to the possible size of the damage award. "Focusing predominantly on the plaintiffs' intent in bringing the suit," it is clear that injunctive relief predominates in this case. *Id.* at 1234. Plaintiffs' prayer for injunctive relief and the declarations supporting this motion plainly demonstrate that the primary goal of the litigation is to secure the rights of demonstrators in the future, *i.e.* by holding the LAPD accountable for failing to comply with policies and practices that it promised to implement pursuant to prior settlement agreements. *See* FAC ¶¶ 114–117; Reply Ex. A (LAPD's summary of *NLG* Settlement); Reply Ex. B (Plaintiffs' supplemental declarations); Mem. Ex. 37 (text of *NLG* Settlement).

### 3. *Manageability considerations.*

Defendants raise vague concerns about manageability in connection with the potential size of the injunctive class. Manageability considerations do not justify denial of certification of a Rule 23(b)(2) class. *See Elliott,* 564 F.2d at 1229 ("The [defendant] does not cite, nor can we find, any authority which supports his rather novel theory limiting (b)(2) class actions because of their numerosity and manageability problems. By its terms, Rule 23 makes manageability an issue important only in determining the propriety of certifying an action as a(b)(3), not a(b)(2), class action.").

### E. **Rule 23(b)(3) Requirements**

The key questions under this analysis are: (1) whether common issues predominate over questions affecting only individual members

---

8. Defendants cited one mass demonstration case in which Rule 23(b)(2) certification was denied, but on the ground that the class definition was inadequate (because it depended on the "state of mind" of class members and defendants). *See*

*Vietnam Veterans Against the War v. Benecke,* 63 F.R.D. 675, 679–80 (W.D.Mo.1974) (proposed class "would encompass all persons of political or social persuasion different than government officials and officers" of the city).

and (2) whether the putative class action is superior to other methods for fair and efficient adjudication of the issues. Fed. R.Civ.P. 23(b)(3). "Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Advisory Committee Notes, 39 F.R.D. 69, 102–103.

### 1. Rule 23(b)(3) factor one: Predominance.

"When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon,* 150 F.3d at 1022. When one or more of the central issues in the action are common to the class, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members. *See Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1163 (9th Cir.2001) (holding that Rule 23(b)(3) predominance requirement was satisfied where all liability issues in employment case were the same and the only individualized issues related to the calculation of damages); *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 428 (4th Cir.), *cert. denied* 542 U.S. 915, 124 S.Ct. 2837, 159 L.Ed.2d 287 (2004) (stating that because Rule 23(b)(3) actions usually require individual proof of damages, courts usually find predominance requirement satisfied if common questions predominate over individual questions as to liability).

As discussed below, the common issues in the First Amendment claim, Fourth Amendment claim, *Monell* claim, and *respondeat superior* liability are more than sufficient to meet the predominance requirement of Rule 23(b)(3). Because the record thus far is insufficiently developed as to the alleged Fourteenth Amendment violations, the Court declines at this time to include those claims among those the class may pursue.

(a) First Claim for Relief: First Amendment, § 1983 claim.

■■■ As to the First Amendment claim, Plaintiffs are correct that the only material fact is that the LAPD decided to declare an unlawful assembly and disperse the crowd. Even the LAPD Report states that the First Amendment rights of peaceful individuals and members of media were curtailed. LAPD Report at 51–52. However, an individual question exists as to whether each class member, such as a random passerby, actually was engaged in protected First Amendment activity.

From a practical point of view, common questions predominate, largely because most of those present were engaged in protected activity. *See* LAPD Report at 4, 51, 52. Given the intangible nature of First Amendment rights and values, it makes sense to assess damages on this claim on the basis of criteria applicable to the class as a whole, such as the degree to which the police action curtailed the planned events. The court or jury could then determine the total compensation appropriate for that loss or the reasonable award for each victim. *See, e.g., Dellums,* 566 F.2d at 174 (jury awarded uniform compensatory damages per class member for violations of First Amendment rights).

(b) Third, Fifth, Sixth and Seventh Claims for Relief: Fourth Amendment and related state claims for excessive force.[9]

■■■ The Fourth Amendment prohibits the use of unreasonable force in effecting a search or seizure of a suspect. The LAPD use or threat of force against the assembled crowd may constitute a seizure,[10] although

---

**9.** Counsel for Defendants acknowledged at the hearing that the Fourth Amendment claim will be similar to the state law claims for most putative class members.

**10.** *See California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("The word 'seizure' readily bears the meaning of laying on of hands or application of physical force to restrain movement, even when it is ultimately

there are individual factual questions as to whether a given officer caused a particular individual to be displaced by the use or threat of force. The parties focus their arguments not on whether there was a seizure, but on whether the actions of the police officers were reasonable. Thus, Plaintiffs focus on the LAPD commanders' authorization of "less lethal" force (as distinct from the *application* of such force).

At the hearing on this motion, Defendants opposed certification because the LAPD is in the process of investigating which individual officers may be subject to discipline or liability. However, the scope of the Department's investigation is necessarily limited. It is difficult to determine the identity of the officers responsible for any particular injuries, because the officers wore riot gear that obscured their name tags and they fired munitions from various skirmish lines. Despite the extensive video coverage of the event, thus far the LAPD has identified only twenty-six officers for individual investigations. Hence, individualized assessments of whether an officer's use of force was reasonable will not be possible for the majority of putative class members. The LAPD's internal investigation is not a reason to defer certification.

The Court recognizes that the conduct of individual officers in the field may present individual issues of reasonableness, namely whether it was reasonable under the circumstances for a particular officer to fire less-lethal munitions, use his baton to strike people, or use other forms of force, such as pushing and shoving.

Nonetheless, the individual issues share a common source: the command decisions to disperse the crowd and to authorize the use of less-lethal munitions if the crowd's behavior warranted it. LAPD Report at 8, 34–35. Because the legality of these command decisions is the overriding common question, the predominance requirement is met as to the Fourth Amendment claim.

(c) The *Monell* claim and *respondeat superior.*

■ Municipal liability for civil rights violations and employer liability under tort law present predominantly common issues as well. Municipal liability under § 1983 requires proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose "moving force" is the policy or custom. *Monell v. Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To hold the municipality liable, a plaintiff must demonstrate that the official policy "evidences 'a deliberate indifference' to his constitutional rights," and caused his injury. *See Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Plaintiffs allege that the City's failure to implement policies to ensure the rights of demonstrators, given the City's obligations under the *NLG* and *Crespo* settlements, arises to a municipal policy or custom of deliberate indifference to the First Amendment rights of the public. The elements of Plaintiffs' *Monell* claim rely on proof involving the City of Los Angeles's policies and practices, and will not require facts individual to each class member's claims.

For an employer to be liable for an assault or other intentional tort, the tort must have a causal nexus to the employee's work. *Lisa M. v. Henry Mayo Newhall Memorial Hospital,* 12 Cal.4th 291, 297, 48 Cal.Rptr.2d 510, 907 P.2d 358 (1995). Here, for the most part whether the actions of the individual police officers have the requisite causal nexus will be a common question, because the police officers had been assigned to crowd control for the event and most incidents of use of force occurred as a result of the command decisions.

*2. Rule 23(b)(3) factor two: Class treatment is a superior method of adjudication.*

■ Rule 23(b)(3) specifies four nonexclusive factors that are "pertinent" to a determi-

---

unsuccessful."); *Marbet v. City of Portland,* 2003 WL 23540258 (D.Or.2003) (holding that plaintiffs stated a Fourth Amendment claim where police moved a crowd of protestors 120 feet through use of pepper spray and physical force).

nation of whether class certification is the superior method. Fed.R.Civ.P. 23(b)(3). They are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. *Id.* Courts have discretion under Rule 23 to decline to certify a class action when it would bring about "undesirable results." Advisory Committee Notes, 39 F.R.D. 69, 103.

(a) The interests of class members in individually controlling separate actions and the extent and nature of litigation already commenced.

Defendants argue that class members' individual damages are not small, that they have an emotional stake in the litigation and that they will therefore want to individually prosecute the action. Defendants further claim there is a likelihood of more opt-outs than class members. Defendants provide little support for this argument. Of the more than 6,000 people in the damages class, 300 or so have filed claims (individually or in a group) against the City. Thirteen lawsuits are currently pending: six before this Court and seven in state court. MIWON counsel claims to represent over 176 claimants who have agreed to be a part of the class action. Realistically, the only people who may choose to opt out are those who are prosecuting their own lawsuits in federal or state court. Whatever the number, they will represent a small minority of claimants. In any event, the fact that some class members may wish to opt out does not lead to the conclusion that a class action is inappropriate, because it is their right under Rule 23(b)(3) and not uncommon in large class actions.

(b) The desirability of concentrating the action.

This factor favors class certification because all claims arise from same location,

date, and time period. FAC ¶ 87. The Court is amenable to coordinating the federal cases with those in state court.

(c) Manageability.

Plaintiffs have anticipated many of the management concerns the Court might have. A number of management tools are available to addressed individualized damages issues, such as bifurcating liability and damages trials, appointing a magistrate judge or special master to preside over damages proceedings, and creating subclasses as permitted under Rule 23(c)(4). Plaintiffs note that damages may be assessed class-wide based on a formula or through test trials. Plaintiffs also have contemplated various methods of providing the best notice practicable. *See* FAC ¶ 89. In general, their proposals and the Court's willingness to consider other proposals dispel any real concerns about manageability.

(d) General appropriateness.

Rule 23(b)(3) classes certified in mass demonstration cases are not new. *See Vodak v. City of Chicago,* 2006 WL 1037151 at *1, *6 ((N.D.Ill.2006) (protesters were detained, arrested, and/or charged); *Hickey v. City of Seattle,* 236 F.R.D. 659, 660–61, 664–67 (W.D.Wash.2006) (protesters were surrounded by police in a "no protest zone" and arrested). Vietnam War protests in Washington D.C. also gave rise to a prominent Rule 23(b)(3) class action). *See Dellums v. Powell,* 566 F.2d 167, 174 (D.C.Cir.1977) (a class consisting of all persons who were arrested while assembled on the Capitol steps on May 5, 1971). *But see McCarthy v. Kleindienst,* 741 F.2d 1406, 1415 n. 11 (D.C.Cir.1984) (deferring to district court's denial of class certification and noting that "*Dellums* consisted only of those persons arrested on the steps of the U.S. Capitol, a much more cohesive group than the approximately 7,000 putative class members here who were arrested throughout the city."). Courts have also certified Rule 23(b)(3) classes in contexts analogous to mass demonstrations. *See, e.g., Tardiff v. Knox County,* 365 F.3d 1, 6–7 (1st Cir.2004) (strip searches of pre-arraignment jail detainees); *Williams*

*v. Brown,* 214 F.R.D. 484, 485 (N.D.Ill.2003) (detention and searches of neighborhood residents during a basketball tournament); *Doe v. Calumet City, Illinois,* 754 F.Supp. 1211, 1212 (N.D.Ill.1990) (strip searches of female arrestees).

It bears emphasizing that the primary policy of the class action mechanism is to enable the collective vindication of the rights of numerous persons whose claims are not worth litigating in individual actions. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). As Plaintiffs point out, this rationale is particularly applicable here, where some class members may feel hesitant about coming forward on their own because they may be (or were at the time) in this country unlawfully. *Cf. Patrykus v. Gomilla,* 121 F.R.D. 357, 361 (N.D.Ill.1988) (certifying a class of 50 patrons of gay bars who were harassed and arrested by police, taking into consideration the potential social prejudice against homosexuals that may deter class members from suing in their own names).

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for class certification. By not later than January 4, 2008 Plaintiffs shall lodge a proposed order consistent with this ruling and with practice under Rule 23.